Robert F. SNYDER, Respondent
Below–Appellant,

v.

Thomas F. ANDREWS, Petitioner
Below–Appellee.

No. 482, 1996.

Supreme Court of Delaware.

Submitted: Dec. 19, 1997.
Decided: March 24, 1998.

Joseph Scott Shannon, Deputy Attorney General, Wilmington, for appellant.

Thomas F. Andrews, pro se, Glenolden, Pennsylvania, appellee.

Bernard J. O'Donnell, Assistant Public Defender, Wilmington, court-appointed amicus curiae.

Before VEASEY, C.J., WALSH and HARTNETT, JJ.

1. 67 Del.Laws c. 130.

2. 11 Del.C. § 4354.

**HARTNETT, Justice:**

We consider the issue of how good time credits are to be deducted from the period of incarceration for an inmate who is serving two prison terms, one for crimes committed before the enactment of the Truth-in-Sentencing Act of 1989[1] ("the Act"), and the other for crimes occurring after the new law became effective. The Act applies to sentences for crimes committed after June 29, 1990 and, among other things, it eliminated parole.[2] The Act also significantly reduces the amount of good time credits available to diminish an inmate's period of incarceration.[3] As will be seen, the Act does not address how good time credits are deducted if there are multiple sentences, some imposed before and some after the effective date of the Act.

### Nature of Proceedings

While incarcerated, Thomas Andrews, the appellee, sought a writ of mandamus in the Superior Court seeking to compel Warden Robert F. Snyder of the Department of Correction ("Department") to reallocate the good time credits he has already earned while in custody. Andrews is serving multiple sentences, some imposed for crimes committed prior to the effective date of the Truth-in-Sentencing Act and some imposed for crimes committed after the Act became effective. The Superior Court agreed with Andrews and issued a writ of mandamus directing Warden Snyder to reallocate the good time credits. The primary issue presented in this appeal is whether Andrews is entitled (as he claims) to have some of the good time credits he has earned while incarcerated credited now to the sentences he received on crimes committed after the effective date of the Act or whether his good time credits should not be credited until the end of all the sentences he is now serving. Unlike the Superior Court, we find that the Department is correct in its assertion that Andrews is not entitled to any good time being credited against his various sentences until the end of his total term of incarceration.

3. *Compare* 11 Del.C. §§ 4381–84 (repealed 1989) (good time computation before the Act) *with* 11 Del.C. § 4381–82 (adopted 1989) (good time computation after the Act).

We also find that the method used by the Department to credit Andrews with good time does not violate any ex post facto right and we, therefore, **REVERSE.**

### The Facts

The facts are not in dispute. On June 26, 1991, Andrews was sentenced in the Superior Court to two consecutive seven-year prison terms for two separate charges of violating probation on sentences imposed for crimes that occurred prior to June 29, 1990, the effective date of the Truth-in-Sentencing Act. The June 1991 sentences were imposed in accordance with the statutory provisions that existed prior to the enactment of the Act and carry the possibility of parole. Subsequently, on October 11, 1991, Andrews was sentenced in the Superior Court to two consecutive two-year terms of imprisonment for two new crimes that occurred after June 29, 1990. The later October 1991 sentences were imposed after the Act became effective and are not subject to parole eligibility.

Good time credits on a sentence imposed after the Act are earned at a significantly lesser rate than under a sentence imposed prior to the Act. Where there are multiple sentences, some based on crimes occurring before the Act and some based on crimes occurring after the Act, the Department first computes the estimated good time credits based on the total of the inmate's sentences imposed prior to the Act and then separately computes the estimated good time credits based on the total of the inmate's sentences imposed after the Act. The sum total of the inmate's estimated good time under both computations is then conditionally subtracted from the total prison terms that the inmate is serving. The Department used this method to calculate and credit the good time that Andrews has already accumulated. Andrews concedes that the Department properly calculated all of the good time to which he is conditionally entitled. His dispute relates solely to the Department crediting his good time to the end of his total prison terms.

The dispute over the Department's method of crediting good time arises from 11 Del.C. § 4216(a), which was adopted in 1989 as part of the Truth in Sentencing Act. This section attempted to provide for the transition from the prior sentencing provisions to the new provisions. 11 Del.C. § 4216(a) provides:

> Where an inmate is serving a sentence to Level V (incarceration) imposed not under the Truth in Sentencing Act of 1989 and receives a subsequent sentence to Level V under the provisions of the Truth in Sentencing Act, serving of the earlier sentence shall be suspended and the inmate shall serve the new Level V sentence until it is completed and then resume serving the original sentence.

Section 4216(a) thus requires Andrews to first serve the sentences imposed after the Act became effective before resuming service of his prior sentences. Accordingly, the Department interrupted the awarding of good time on Andrews' fourteen-year prison term that had been imposed for crimes committed prior to the Act while he served his four-year term imposed for crimes committed after the Act became effective.

### The Superior Court Proceedings

Andrews filed a *pro se* petition for a writ of mandamus in the Superior Court alleging that the Department acted incorrectly when it deducted from his total eighteen-year term of incarceration the good time credits that he has earned while serving the four-year prison term imposed after the Truth-in-Sentencing Act had been enacted. Andrews asserted that he is entitled to have now deducted from his four-year prison sentence that was imposed after the Act was enacted the good time credits that he already has earned while serving that sentence. The net result to Andrews, if the good time he has earned is applied to reduce his four-year after Truth-in-Sentencing prison term rather than his eighteen-year aggregated term, would be a reduction on his four-year after Truth-in-Sentencing sentence and concomitant earlier return to serving the sentence imposed prior to the Act.

If this is done, Andrews will accrue good time at a rate greater than on the sentence imposed after the Act. If he is correct, his parole eligibility date under the sentence imposed before Truth-in-Sentencing will be nearly five and one-half months earlier than

it will be using the Department's method of crediting good time. He, therefore, claims he would be released 5½ months earlier at the end of all of his sentences.[4]

The Superior Court concluded that the language of the Truth-in-Sentencing Act imposed a duty upon the Department to now credit Andrews with the good time credits he has acquired while serving his post-Act sentence so that he will complete that sentence sooner and will then earlier return to serving the sentences imposed before the Act became effective. Accordingly, the Superior Court issued a writ of mandamus to Warden Snyder directing him to credit the good time as Andrews requested. This appeal ensued.

After reviewing the briefs, the Court appointed Bernard J. O'Donnell, Esquire, to file a brief as amicus curiae in support of Andrews' position.[5] The amicus asserts that the Superior Court's decision was not only reasonable and correct but was mandated by controlling constitutional principles.

The amicus contends that Andrews was disadvantaged by the operation of 11 Del.C. § 4216(a), which is part of the Truth-in-Sentencing Act, because it provides that he must serve first the sentences imposed after the Act. The amicus further asserts that Andrews was disadvantaged because the Department will not credit him with the good time he has accrued under the sentences he received after Truth-in-Sentencing until the end of his aggregated sentences, thus having the effect of delaying Andrews' parole eligibility date by more than five months. The amicus concludes that, because the Truth-in-Sentencing Act was enacted after Andrews had been sentenced for his earlier offenses, the ex post facto clause of the United States Constitution forbids the alleged disadvantage caused by a retroactive application of 11 Del.C. § 4216(a).[6]

### Writ of Mandamus Standard and Scope of Review

■ A writ of mandamus may be issued by the Superior Court to an inferior court, public official, or agency to compel the performance of a duty to which the petitioner has established a clear legal right.[7] In this case, the Superior Court determined that the Department had a mandatory duty to now credit Andrews with the good time he has accrued while serving his four-year post-Truth-in-Sentencing Act prison term rather than deducting his accrued good time at the end of his entire eighteen-year prison term. The Superior Court decision is based on its construction of the good time provisions of the Act.[8]

**4.** The Department maintains that if Andrews is correct, the method of crediting good time he advocates will cause some other inmates to be incarcerated for longer periods.

**5.** The Court gratefully acknowledges the pro bono participation of Mr. O'Donnell as amicus curiae in this case. His service is in the highest tradition of the Delaware bar.

**6.** *Lynce v. Mathis*, 519 U.S. 433, 117 S.Ct. 891, 137 L.Ed.2d 63 (1997).

**7.** *Clough v. State*, Del.Supr., 686 A.2d 158, 159 (1996); 10 Del.C. § 564 (1975).

**8.** 11 Del.C. § 4381 (adopted 1989), provides:

(a) All sentences imposed for any offenses other than a life sentence imposed for class A felonies may be reduced by earned good time under the provisions of this section and rules and regulations adopted by the Commissioner of Corrections.

(b) "Good time" may be earned for good behavior while in the custody of the Department of Corrections when the person has not been guilty of any violation of discipline, rules of the Department or any criminal activity and has labored with diligence toward rehabilitation according to the following conditions:

(1) During the first year of any sentence, good time may be awarded at the rate of 2 days per month beginning on the first day of confinement.

(2) After completing 365 days of any sentence, good time may be awarded at the rate of 3 days per month.

(3) No person shall be awarded more than 36 days of good time under this subsection for good behavior in any 1 year consisting of 365 calendar days actually served.

(c) "Good time" may be earned for participation in educational and/or rehabilitation programs as designated by the Commissioner under the following conditions:

(1) Good time may be awarded for satisfactory participation in approved programs at a rate of up to 2 days per calendar month.

(2) No more than 24 days of program good time total as established in this subsection may be awarded in any 1 year consisting of 365 days actually served.

(d) "Good time" may be earned by participation in work programs as authorized by

■ We review statutory construction issues *de novo* to determine if the Superior Court erred as a matter of law in formulating or applying legal precepts.[9]

### Legislative Intent and Statutory Construction

■ In construing a statute, a Court first must look to the text of the statute in its context to determine if it is ambiguous.[10] A statute is ambiguous if it "is reasonably susceptible of different conclusions or interpretations."[11] A statute also may be found to be ambiguous if a literal interpretation of the words of the statute would lead to a result so unreasonable or absurd that it could not have been intended by the legislature.[12] If the statute is ambiguous, a court must seek to resolve the ambiguity by ascertaining the legislative intent.[13] If, however, the statute is unambiguous and an application of the literal meaning of its words would not be unreasonable, then there is no basis for an interpretation of those words by the court.[14] The text of the pertinent statute is unclear and, if applied as Andrews claims, it would lead to an absurd or unreasonable result.

The Superior Court found that the issue of when good time should be credited to an inmate serving a sentence imposed after the effective date of the Truth-in-Sentencing Act was controlled by the text of 11 Del.C. § 4381(b). The Superior Court, in finding that statute to be unambiguous, stated:

The issue in this case is one of statutory construction. In interpreting a statute, the Court's role is to determine and give effect to the legislature's intent. Where the intent of the legislature is clearly reflected by unambiguous language in the statute, the language itself controls.

The statutory language controlling the dispute says:

"Good time" may be earned for good behavior while in the custody of the Department of Corrections [sic]. 11 Del.C. § 4381(b).

In addition, as to programmatic good time it:

may be earned for participation in educational and/or rehabilitation programs. 11 Del.C. § 4381(c).

The "while in custody" language is crucial. Andrews was in the Department's custody during 1991–1995 because of a TIS [Truth-in-Sentencing] sentence. While serving that sentence, the law provides he is eligible to earn various forms of good time. Also, he earns programmatic good time if he participates in programs which by definition must occur while he is serving his TIS sentence. If he participated in such programs while serving his non-TIS sentence, he would have to be awarded credit time at a more generous rate (5 days versus 2 days).

The Department should have credited Andrews' TIS good time both straight and programmatic during the time he served his TIS sentences. This statutory duty is clear. Under these circumstances mandamus is warranted. . . .

The Superior Court noted that the "practical effect" of its ruling was to advance Andrews' parole eligibility date on the earlier sentence imposed upon him before the Act became effective. The Court further stated that it was "mindful that a result of this opinion is to make calculation of good time more burdensome." The Court did not address, however, what impact its interpretation of 11 Del.C. § 4381(b) would have upon

§ 6532 of this title at a rate of up to 2.5 days per month with a limit of 30 days earned during any 1 year consisting of 365 days actually served.
(e) No more than a total of 90 days of "good time" may be earned in any 1 year consisting of 365 days actually served.

9. *Zimmerman v. State*, Del.Supr., 628 A.2d 62, 66 (1993); *Watson v. Burgan*, Del.Supr., 610 A.2d 1364, 1367 (1992).

10. *State Dept. of Labor v. Reynolds*, Del.Supr., 669 A.2d 90, 93 (1995).

11. *Coastal Barge Corp. v. Coastal Zone Indus. Control Bd.*, Del.Supr., 492 A.2d 1242, 1246 (1985).

12. *DiStefano v. Watson*, Del.Supr., 566 A.2d 1, 4 (1989).

13. *Acierno v. Worthy Bros. Pipeline Corp.*, Del. Supr., 656 A.2d 1085, 1088 (1995).

14. *DiStefano v. Watson*, 566 A.2d at 4.

the sentences imposed on Andrews after the Act.[15] It is unclear from the Superior Court's decision whether the crediting of Andrews' good time to the sentences imposed upon him after the Act would also vest in Andrews a right to those good time credits so that they could no longer be forfeited, or if the good time credits would remain subject to forfeiture throughout his entire period of incarceration, as is generally the case.

We also find the Superior Court result to be unreasonable if 11 Del.C. § 4381 is read, as it must be, *in pari materia* with other related sections of Title 11, including those enacted before and after the Act.[16]

Before turning to the questions raised by the Superior Court's construction of 11 Del.C. § 4381, we review the historical development of good time in Delaware. It has led to a dual system for awarding, forfeiting, and restoring good time credits both before and after Truth-in-Sentencing.

### Award of Good Time Credits

Delaware courts, like many state and federal courts, are increasingly faced with disputes involving inmates' claims to good time.[17] Yet very little scholarly attention has been given to this complicated area of the law, leaving "a gap in knowledge regarding how good time is awarded, forfeited, and restored."[18] The laws relating to good time differ significantly from jurisdiction to jurisdiction.[19] These differing laws reflect varying judgments about the value and the purpose of good time.[20]

The purpose of good time in Delaware has been described as an "administrative rehabilitative device" that provides for an inmate's early release from his or her term of imprisonment.[21] Good time does not exist as a matter of constitutional right.[22] Rather, the allowance of good time to an inmate is strictly a matter of statute.[23] An inmate therefore has no greater right to good time grace than is provided in the statutes authorizing its award.[24] By the same token, the Department also is bound by the good time statutes and may not mold the statutes "to suit its own views of the best correctional practices and procedures."[25]

Both before and after Truth-in-Sentencing, good time consists of two types of credits: behavior credits and merit credits.[26] Behav-

---

**15.** We recognize that the Superior Court did not have the extended briefing (including briefing by the amicus and supplemental briefing) as occurred in this court.

**16.** *See Watson v. Burgan,* 610 A.2d at 1367, 1368.

**17.** *See generally* 72 C.J.S. *Prisons* §§ 144–53 (1987) (collecting cases).

**18.** James B. Jacobs, *Sentencing by Prison Personnel: Good Time,* 30 UCLA L.Rev. 217, 219–20 (1982).

**19.** *See id.* at 221–22.

**20.** *Id.*

**21.** *Woodward v. Department of Corrections,* Del.Super., 415 A.2d 782, 784, *aff'd,* 416 A.2d 1225 (1980). Professor Jacobs' article identifies several purposes behind early good time laws in this country, including: (a) maintaining prison discipline and control; (b) improving or reforming the prisoner; (c) getting more work out of the prisoner; and (d) mitigating the severity of the sentence. *See Jacobs, supra,* n. 18 at 220 n. 8. Professor Jacobs notes, however, that some good time laws continue to exist today simply as a matter of custom, even though the laws "have long since lost their raison d'etre." *Id.* at 221.

**22.** *Weber v. State,* Del.Supr., 655 A.2d 1219, 1223 (1995) (citing *Wolff v. McDonnell,* 418 U.S. 539, 557, 94 S.Ct. 2963, 2975, 41 L.Ed.2d 935 (1974)); *DiStefano v. Watson,* Del.Supr., 566 A.2d 1, 7 (1989).

**23.** *Nardini v. Willin,* Del.Supr., 245 A.2d 164, 165 (1968).

**24.** *Id.*

**25.** *Id.*

**26.** This has not always been the case. When Delaware enacted its first good time statute in 1915, good time consisted only of credits awarded for an inmate's compliance with prison rules. *See* Revised Code of Delaware § 3614 (1915). Good time credits for rehabilitative achievement were not statutorily authorized until 1972. *See* 58 Del.Laws c. 469. Up until the 1960s, most prisoners in Delaware were required to work during their terms of incarceration. Accordingly, the first statute allowing good time credits to be awarded to inmates for working while incarcerated was not adopted until the 1970s. *See* 62 Del.Laws. c. 96.

ior credits may be awarded for an inmate's continuing compliance with the Department's disciplinary rules and regulations.[27] Merit credits may be earned for an inmate's participation in certain education, rehabilitation, or work programs.[28]

The rate at which good time credits may be earned on sentences imposed after the Act is significantly less than on sentences imposed before the Act.[29] Therefore, the Department necessarily must perform two separate calculations in computing an inmate's good time credits (assuming the inmate is serving sentences imposed both before and after the Act). Although the applicable rates vary, the Department employs the same methodology in performing these separate calculations.

For example, in Andrews' case, in order to compute his behavior credits on his sentences imposed before the Act, the Department aggregated his two seven-year sentences and then computed all of the behavior credits that Andrews possibly could earn on his fourteen-year sentence term.[30] This calculation was performed as of the day that Andrews' began serving the two seven-year sentences imposed before Truth-in-Sentencing. All of those behavior credits will be automatically deducted from the end of Andrews' total prison term unless he subsequently commits a disciplinary infraction that causes all or a part of those behavior credits to be forfeited.[31] Merit credits awarded to Andrews during the two sentences imposed before Truth-in-Sentencing are computed monthly based on Andrews' actual participation in qualified programs, and also will be deducted from the end of Andrews' total prison term.

Similarly, as to Andrews' good time credits earned during the sentences imposed after the Act, the Department added together the two two-year sentences that Andrews received and computed the maximum amount

27. *Compare* 11 Del.C. § 4382 (1987) (before the Act) *with* 11 Del.C. § 4381(b) (1995) (after the Act).

28. *Compare* 11 Del.C. § 4384 (1987) (before the Act) *with* 11 Del.C. §§ 4381(c), (d) (1995) (after the Act).

29. Under the plan before the Act, behavior credits could be earned at a rate of 5 days per month during the first year of the inmate's term, 7 days per month during the second year, 9 days per month during the third year, and 10 days per month after the third year. 11 Del.C. § 4382 (1987). Merit credits on a before-the-Act sentence could be earned at a rate of 5 days per month. 11 Del.C. § 4384 (1987). After the Act, behavior credits may be earned at a rate of 2 days per month during the first year and 3 days per month for every year thereafter. Merit credits for participating in programs may be earned at a rate of 2 days per month. Merit credits for working may be earned at a rate of 2.5 days per month. No more than 90 after-the-Act good time credits may be earned per year. 11 Del.C. § 4381 (1995).

30. The Department's policy of aggregating, or "stacking," before-the-Act sentences for purposes of computing good time is based upon Department of Correction Regulation § 1134 (adopted Sept. 19, 1978). That regulation provides in relevant part: "For the purpose of computing the reduction of confinement time, consecutive sentences are regarded "back to back" (added together) and the total possible reduction time is based on the total of the sentences." Although this regulation was adopted well before the enactment of the Act, it serves as the cornerstone for the Department's policy with regard to computing good time on after-the-Act sentences, also. This Court reviewed and approved Regulation 1134 in *Watson v. Burgan*, Del.Supr., 610 A.2d 1364 (1992).

31. The Department's practice of computing before-the-Act behavior credits at the beginning of an inmate's sentence and deducting them from the end of the inmate's sentence, rather than computing and deducting the credits on a monthly basis as they are earned, has been questioned by the courts. *See Stirparo v. State*, Del.Super., 297 A.2d 406 (1972), *aff'd*, Del.Supr., 310 A.2d 632 (1973); *State v. Clark*, Del.Super., 1995 WL 44582, \*19 n. 23, Barron, J. (Jan. 5, 1995). In spite of this criticism, the Department's practice of "front-loading" good time has continued "without interference from the General Assembly." *Watson v. Burgan*, 610 A.2d at 1368.

Professor Jacobs explains that the reason some prisons calculate and credit good time automatically in a lump sum at the start of an inmate's sentence rather than month by month as it is earned is because:

[t]he latter method forces the prison to constantly recalculate the prisoners' release dates. This recalculation, of course, is an enormous administrative burden. In large prison systems with vast inmate turnover and scarce resources, it is inconceivable that a thoughtful decision could be made each month as to whether an individual prisoner deserves to be awarded good time.

Jacobs, *Good Time*, at 224–25 (footnotes omitted).

of behavior credits available on the four-year post-Act sentence term. Those behavior credits were also calculated as of the day that Andrews began serving his sentences imposed after the Act and will be deducted automatically at the end of Andrews' total 18–year prison term unless Andrews commits a disciplinary violation.

Andrews' post-Act merit credits also are computed on a monthly basis, are awarded only for actual participation, and will also be subtracted from the end of his total 18–year prison term, provided he commits no violations of prison rules.

The effect on an inmate's sentence of the Department's method of computing and crediting good time credits is better understood when applied to an inmate who is serving only one sentence imposed either before or after the Act. It is more difficult to analyze the effects of the Department's methodology in Andrews' case because of the applicability of two separate and distinct good time plans, each with its own mutually exclusive provisions for awarding, forfeiting, and restoring good time. To understand how the two good time plans operate in conjunction with each other, it is helpful to understand how good time operates under each system independently.

### Good Time Before the Truth in Sentencing Act of 1989

 Under the system in effect before the enactment of the Truth-in-Sentenc-

ing Act, good time operated in two ways to permit an inmate's early release from his term of incarceration. First, an inmate, in most cases, would have become eligible to apply for parole under 11 Del.C. § 4346 after serving one-third of the sentence imposed by the court, after the sentence was reduced by any good time award.[32] Second, even if the inmate failed to obtain a discretionary grant of parole under 11 Del.C. § 4346, the inmate could still achieve early release from his prison term, called "conditional release," solely by virtue of his accumulated good time credits.[33] Conditional release is an early release mechanism that operates only if parole is not employed.[34] Unlike parole, conditional release is not discretionary.[35] The Department is required to release an inmate from prison once the inmate has served his "term or terms in incarceration" less his accumulated good time credits. 11 Del.C. § 4348.

Prior to the Act, it was clear that good time credits did not diminish the overall length of a sentence imposed by the court.[36] Any inmate who achieved early release from a prison term imposed before the Act, whether on parole or on conditional release, was required by law to remain on parole or conditional release, under the Board of Parole's supervision, until the maximum expiration date of the prison sentence, *unless* the Board of Parole discharged him earlier.[37] Thus, early release from incarceration, either on

---

**32.** *Stirparo v. State,* Del.Super. 297 A.2d 406, 409, *aff'd,* 310 A.2d 632 (1973).

**33.** *See* 11 Del.C. § 4348 (1995). 11 Del.C. § 4348 provides:

A person having served that person's term or terms in incarceration, less such merit and good behavior credits as have been earned, shall, upon release, be deemed as released on parole until the expiration of the maximum term or terms for which the person is sentenced. A person may waive his right to conditional release, in which case he shall serve the remainder of his term or terms in prison. Such waiver shall be in writing. Only persons who have been committed for 1 year or more shall be deemed to be released on parole, provided, the Department by general rule may lower said period of time.

**34.** *Woodward v. Department of Corrections,* Del.Super., 415 A.2d 782, 784, *aff'd,* 416 A.2d 1225 (1980).

**35.** *Jackson v. Multi–Purpose Crim. Justice Facility,* Del.Supr., 700 A.2d 1203, 1206 (1997).

**36.** *Woodward v. Department of Corrections,* 415 A.2d at 784.

**37.** *See Hall v. Carr,* Del.Supr., 692 A.2d 888, 892 (1997) (citing 11 Del.C. § 4347(c)); *Woodward v. Department of Corrections,* 415 A.2d at 784 (citing 11 Del.C. § 4348). An exception to this rule is for inmates who are sentenced to less than one year in jail and who are conditionally released under 11 Del.C. § 4348. Section 4348 provides that only inmates committed for a year or more are deemed to be released on parole under that section. Presumably, inmates serving shorter sentences do not accumulate significant enough amounts of good time to justify parole supervision after their early release from incarceration. Those inmates sentenced to less than one year in jail, therefore, may be unconditionally released from their prison terms. Hence, their court-

parole or on conditional release, did not mean that an inmate was released from serving the entire sentence imposed by the court. Rather, release on parole or conditional release was merely "intended to substitute a separate form of discipline for prison discipline." [38]

Furthermore, even after an inmate was released on parole, his good time credits remained subject to forfeiture if he did not comply with the conditions of his early release. In *Spurlin v. Department of Corrections*,[39] this Court stated that, "It is not necessarily true that earned good time prior to parole becomes a right vested in a prisoner which may not be taken from him." We found it "necessary that there be some coercive threat of retribution" to encourage parolees to abide by the conditions of their early release from incarceration throughout their entire period of parole.[40] The Court further found that the loss of previously earned good time for a parole violation was consistent both with the Board of Parole's legislatively-granted authority to enter orders "as it may see fit" upon finding a parole violation and with the good time forfeiture statute that authorized the Department to deduct "a portion or all" of the inmate's previously allowed good time for violating Department rules.[41]

In the case of incarcerations prior to Truth-in-Sentencing, it is clear that good time credits accumulated by an inmate while incarcerated did not become a vested right until the inmate completed his entire sentence. The question therefore raised is whether the General Assembly intended to modify this principle when it adopted the Act. Stated another way: Did the General Assembly intend that the good time credited during the serving of a sentence imposed after Truth-in-Sentencing become vested prior to the expiration of the inmate's total sentences?

## Good Time After the Truth in Sentencing Act of 1989

When the General Assembly enacted the Truth in Sentencing Act, one of its stated purposes was to assure "the public ... that the sentence imposed by the Court will be served by the defendant." [42] Another 23–purpose was to "require accountability of the Court in fashioning a sentence." [43] In fulfillment of these objectives, the Act, therefore, abolished parole.

Notwithstanding the stated goal of predictable sentences, the Act retained a modified good time system, which continues to allow prison officials to release an inmate from jail prior to serving the full sentence imposed by the court.[44] Although the Act significantly

imposed sentences, in fact, are reduced by the amount of good time credits they have earned.

**38.** *Watson v. Burgan*, 610 A.2d at 1368.

**39.** Del.Supr., 230 A.2d 276, 277 (1967).

**40.** *Id.* at 278. *See generally* Annotation, *Withdrawal, Forfeiture, Modification, or Denial of Good-time Allowance to Prisoner*, 95 A.L.R.2d 1265, 1276 (1964) (collecting cases) (finding the general rule to be "that the right to credit for good conduct is not a vested right but is only contingent until such time arrives that its allowance will end imprisonment").

**41.** *Id.* at 277.

**42.** *See* 67 Del.Laws c. 130, § 2 that provides:

Section 2. The purposes of this Act are:
A. To achieve truth in sentencing by assuring that the public, the State and the Court will know that the sentence imposed by the Court will be served by the defendant; and that, the

defendant will know what the actual effect of the sentence will be.
B. To require accountability of the Court in fashioning a sentence designed to meet the objectives of SENTAC legislation including, but not limited to providing the least restrictive sentence that assures the public safety, makes use of sentencing alternatives and incarcerates the violence prone offender.
C. To encourage the Courts to impose sentences combining incarceration (where appropriate) with quasi-incarceration and probationary follow-up to assure continued supervision of offenders and their successful reentry into society with minimum risk to society.

**43.** *Id.*

**44.** Not all post-Act sentences are subject to reduction by good time. There are a number of statutes that specifically impose minimum mandatory terms of incarceration for certain offenses or otherwise provide that the sentence for an offense may not be reduced by good time. *See e.g.*, 16 Del. C. § 4753A (adopted 1989).

reduced the rates at which an inmate can earn good time credits, it is still possible for an inmate who earns all the good time credits available under a sentence imposed after the Act to reduce his term of incarceration by 90 days per year or by almost 25%.[45]

The intended effect of good time credits on a sentence imposed after the Act is not entirely clear, however, because, although the Act explicitly abolished parole, it did not explicitly abolish conditional release, which is a form of parole. The parties, however, agree that if Andrews had been serving only a sentence imposed after the Act, then his accumulated good time credits would have permitted his conditional release from imprisonment under 11 Del.C. § 4348, thus permitting him to serve out some of his remaining time as if he was on parole. Accordingly, the parties agree that even under a sentence imposed after the Act, the good time credits earned do not lessen the overall sentence imposed by the court, but merely permit the substitution of a different form of discipline for prison discipline.[46]

### Andrews' Case

In this case, the Superior Court ordered that the good time credits earned by Andrews while serving his two sentences imposed after the Truth-in-Sentencing Act be specifically deducted from those sentences. The Superior Court did not explain, however, how its method of crediting Andrews' good time credits would impact those sentences. There are two possible consequences to crediting Andrews' good time on his sentences imposed after Truth-in-Sentencing using the method ordered by the Superior Court.

First, deducting Andrews' good time credits specifically from his after Truth-in-Sentencing sentences would have the effect of reducing the overall length of those sentences. The parties agree, however, that this

cannot be the result because good time credited on sentences imposed after the Act cannot affect the overall length of the sentences. 11 Del.C. § 4348.

The alternative consequence is that Andrews' good time credits on sentences imposed after the Act, although specifically credited to his after Truth-in-Sentencing sentences, would *not* reduce the overall length of those sentences. Andrews, therefore, would still have to serve a period of conditional release associated on those sentences until he reached the maximum expiration of those sentences.

The Department argues that crediting good time as ordered by the Superior Court under the alternative consequences would lead to a number of absurd results that could not have been intended by the General Assembly. First, Andrews would be conditionally released from his sentences imposed after the Act only to be immediately reincarcerated to finish serving his sentences imposed prior to the Act, thereby violating the spirit of this Court's holding in *Watson v. Burgan*,[47] as is discussed below. Moreover, because an inmate who is conditionally released is required by law to remain on conditional release until the maximum expiration date of his term, Andrews would have to serve in prison the conditional release period associated with his sentences imposed after the Act concurrently with his sentences before the Act. The Department argues that this would be contrary to 11 Del.C. § 4216, that mandates that an inmate's sentence imposed after the Act must be served first until it is completed before the resumption of any sentence imposed before the Act.

We agree with the Department that crediting the good time that Andrews earns on the sentences imposed after the Act in the manner prescribed by the Superior Court would

---

45. *See* 11 Del.C. § 4381(e). The apparent inconsistency between the General Assembly's goal of predictable sentences and its retention of good time after the Act possibly may be explained by Professor Jacobs' observation that good time is a "low-visibility release mechanism," which allows "politicians to promise stiff sentences while shielding the public from the social and economic costs of more imprisonment." Jacobs, supra, at 262–63, n. 16.

46. Given the parties' agreement on this point, we are not required to pass on the issue of whether conditional release remains a viable concept under the Act, and we expressly refrain from opining on this issue. *See Watson v. Burgan*, 610 A.2d at 1368.

47. Del.Supr., 610 A.2d 1364 (1992).

lead to the same anomalous results that this Court criticized in *Watson v. Burgan.*[48] In that case, Burgan pled guilty to first degree assault and possession of a deadly weapon during the commission of a felony. He was sentenced, prior to Truth-in-Sentencing, to ten years on the assault charge and five years minimum mandatory on the weapon charge. Pursuant to the clear language of 11 Del.C. § 1447(c), Burgan was required to serve his nonmandatory assault sentence before serving his mandatory possession of a weapon sentence. Notwithstanding Section 1447(c), the Department had a policy of administratively realigning an inmate's sentences to permit the inmate to serve his minimum mandatory sentence prior to any nonmandatory sentence.[49] The Attorney General issued an opinion criticizing the Department's practice as being contrary to the clear language of Section 1447(c). Based on the Attorney General's opinion, the Department revised its method for calculating parole eligibility and conditional release dates, which had the effect of revoking Burgan's then-existing right to apply for parole.

On appeal, this Court concluded that, despite the clear language of 11 Del.C. § 1447(c), its application to both the parole process and accrued good time credits "created an obvious conflict."[50] The Court found that requiring an inmate to serve a nonmandatory sentence first was "illogical" in Burgan's case because it meant that Burgan's release on parole from his nonmandatory sentence would merely transfer him to a mandatory term of imprisonment to which no parole eligibility or good time credit attaches.[51]

The Court stated:

Such a process is not only illogical, it defeats the goal of release to the community through the gradual process of reduced levels of confinement as a transition to ultimate release....

.... We fail to understand how the beneficial effect of parole supervision can

occur through a prisoner's parole to a mandatory sentence of imprisonment. Such an arrangement is inconsistent with the basic goal of parole.[52]

Thus, the Court concluded in *Burgan* that the Department's original regulation was correctly not controlled by the literal text of Section 1447(c) but by the legislative purpose underlying the statutes for parole eligibility and good time credits.

We find this rationale persuasive in Andrews' case. If the good time credits earned on a sentence imposed after the Truth-in-Sentencing Act do not shorten the overall length of his sentences, then crediting Andrews' good time as ordered by the Superior Court is tantamount to conditionally releasing Andrews' from his sentences imposed after the Act only to have him immediately reincarcerated to serve out the remaining time left on the fourteen-year term sentences imposed before the Act. While such a procedure may be theoretically possible, it is illogical. An inmate who is conditionally released under 11 Del.C. § 4348 is required by law to remain on conditional release until the maximum expiration of his prison term. Thus, to conditionally release an inmate serving a sentence imposed after Truth-in-Sentencing to serve a sentence imposed before Truth-in-Sentencing would require the inmate to serve his period of conditional release in prison concurrently with the sentence imposed before Truth-in-Sentencing. That procedure would "defeat the goal of release to the community through the gradual process of reduced levels of confinement as a transition to ultimate release."[53]

Accordingly, we conclude that the Department's method of calculating and crediting good time for inmates serving sentences imposed both before and after the Act is supported by a reasonable *in pari materia* reading of the applicable statutes. Unlike the method ordered by the Superior Court, the Department's method of crediting good time

---

48. *Id.*

49. *Supra,* n. 29.

50. *Id.* at 1367.

51. *Id.*

52. *Id.*

53. *Id.*

results in the computation of one parole eligibility date and one conditional release date for each inmate, without regard to the number of sentences being served by the inmate. That result is consistent with the basic goals of parole and conditional release as set forth in the statutes.[54]

## Ex Post Facto Clause

We find no merit to the amicus curiae's argument that the ex post facto clause of the Federal Constitution mandates the result reached by the Superior Court. The amicus argues that Andrews was unconstitutionally disadvantaged by the operation of 11 Del.C. § 4216(a), which mandates that he serve the sentences imposed after the Truth-in-Sentencing Act before he serves the sentences imposed before the Act and by the Department's method of granting good time credits, thus effectively delaying his parole eligibility date by over five months.

Article 1, § 10 of the United States Constitution forbids any State from passing an "ex post facto Law." An ex post facto law is one that retroactively alters the definition of a crime or increases the punishment for criminal acts.[55] To fall within the ex post facto prohibition, a law must be retrospective—that is "it must apply to events occurring before its enactment"—and it "must disadvantage the offender affected by it" by altering the definition of criminal conduct or increasing the punishment for the crime.[56]

The change at issue in this case, the enactment of 11 Del.C. § 4216(a), had neither the purpose nor the effect of increasing the quantum of punishment for the crimes committed by Andrews. Section 4216(a) merely requires that an inmate serve the sentence imposed for a later crime, committed after the Act was enacted, before he serves the sentence imposed for an earlier crime committed before the Act. It does not change the sentence imposed nor the substantive formula for securing any reduction to an inmate's term of incarceration.[57] 11 Del.C. § 4216(a) does not impose a greater punishment on Andrews because it is not penal in nature. The real reason that Andrews' parole eligibility date on the sentences imposed before Truth-in-Sentencing has been delayed is because Andrews chose to commit, and was convicted of, a later crime for which he is not eligible for parole. Under the circumstances, we find no violation of the ex post facto clause.

## Conclusion

The judgment of the Superior Court granting Andrews' petition for a writ of mandamus is hereby **REVERSED.**

---

54. *See Watson v. Burgan,* 610 A.2d at 1369.

55. *Collins v. Youngblood,* 497 U.S. 37, 41, 110 S.Ct. 2715, 2718–19, 111 L.Ed.2d 30 (1990).

56. *Lynce v. Mathis,* 519 U.S. at ——, 117 S.Ct. at 896.

57. *California Dep't of Corrections v. Morales,* 514 U.S. 499, 506–08, 115 S.Ct. 1597, 1602, 131 L.Ed.2d 588 (1995).