CML V, LLC, individually and derivatively on behalf of JetDirect Aviation Holdings, LLC, Plaintiff,

v.

John BAX, Gregory S. Campbell, Louis Cappelli, Jane Garvey, Steven M. Hankin, Paul M. Harrington, Donald Hebb, Jeffrey P. Kelly, James W. Marley, Robert P. Pinkas, Peter Sinatra, Stephanie Zimmerman, and JetDirect Aviation Holdings, LLC, Defendants,

and

JetDirect Aviation Holdings, LLC, Nominal Defendant.

C.A. No. 5373–VCL.

Court of Chancery of Delaware.

Submitted: Oct. 7, 2010.
Decided Nov. 3, 2010.

David A. Jenkins, Michele C. Gott, Smith, Katzenstein & Furlow LLP, Wilmington, Delaware; Joseph DiBenedetto, Michael J. Friedman, Winston & Strawn

LLP, New York, New York; Attorneys for Plaintiff CML V, LLC.

Kevin S. Mann, Cross & Simon, LLC, Wilmington, Delaware; Brian E. O'Connor, Dan C. Kozusko, Timothy J. McGinn, Willkie Farr & Gallagher LLP, New York, New York; Attorneys for Defendants John Bax and Steven M. Hankin.

A. Gilchrist Sparks, III, Ryan D. Stottmann, Morris, Nichols, Arsht & Tunnell LLP, Wilmington, Delaware; Attorneys for Defendants Gregory S. Campbell, Louis Cappelli, Jane Garvey, Paul M. Harrington, Donald Hebb, James W. Marley, Peter Sinatra, and Stephanie Zimmerman.

A. Gilchrist Sparks, III, Ryan D. Stottmann, Morris, Nichols, Arsht & Tunnell LLP, Wilmington, Delaware; Jennifer Barrett, Hilary Ormond, Quinn Emanuel Urquhart & Sullivan, LLP, New York, New York, Attorneys for Defendant Jeffrey P. Kelly.

Thomas P. Preston, Alisa E. Moen, Elizabeth A. Sloan, Blank Rome LLP, Wilmington, Delaware; Attorneys for Defendants Robert P. Pinkas and JetDirect Aviation Holdings, LLC.

### *OPINION*

LASTER, Vice Chancellor.

Plaintiff CML V, LLC ("CML") lent funds to JetDirect Aviation Holdings, LLC ("JetDirect" or the "Company"). JetDirect's operating subsidiaries are in bankruptcy, and the complaint plausibly pleads that JetDirect is insolvent. In Counts I–III, CML asserts derivative claims for breach of fiduciary duties against defendants John Bax, Gregory S. Campbell, Louis Cappelli, Jane Garvey, Steven M. Hankin, Paul M. Harrington, Donald Hebb, Jeffrey P. Kelly, James W. Marley, Robert P. Pinkas, Peter Sinatra, and Stephanie Zimmerman (collectively, the "Individual Defendants"). In Count IV, CML sues JetDirect directly for breach of its loan agreement. The defendants have moved to dismiss Counts I–III on various grounds, including that CML lacks standing as a creditor to sue derivatively under Section 18–1002 of the Delaware Limited Liability Company Act (the "LLC Act"), 6 *Del. C.* § 18–1002. The parties agree that if Counts I–III are dismissed, then this Court lacks jurisdiction over Count IV. Conversely, if one of the first three counts goes forward, then jurisdiction over Count IV exists under the clean-up doctrine.

Section 18–1002 limits standing to bring a derivative claim to holders of membership interests in a limited liability company ("LLC") and their assignees. Section 18–1002 does not grant standing to creditors. Although this limitation might surprise wizened veterans of the debates over corporate creditor standing, JetDirect is not a corporation. JetDirect is an LLC, and the plain language of the LLC Act controls. Accordingly, the motion to dismiss is granted.

## I. FACTUAL BACKGROUND

The facts are drawn from the complaint and the documents it incorporates by reference. The plaintiff receives the benefit of all reasonable inferences.

### A. JetDirect's Demise

JetDirect was a private jet management and charter company that, through subsidiaries, provided charter services, prepaid memberships for charter flights, aircraft management services, and maintenance and fuel services. Beginning in 2005, as part of a roll-up strategy, JetDirect acquired a number of small to mid-sized charter and service companies.

JetDirect's aggressive expansion left it with a highly leveraged balance sheet and volatile cash flows. In 2006, JetDirect's

board of managers became aware of serious deficiencies in its accounting system. BKD LLP, JetDirect's auditor, informed the Individual Defendants of nineteen "material weaknesses," "significant deficiencies," and "control deficiencies" in JetDirect's internal controls. A year later, JetDirect's new auditor, Ernst & Young LLP ("E & Y") declined to complete its audit because JetDirect's internal controls lacked sufficient integrity for E & Y to rely on the Company's books. Most notable among these deficiencies was the failure of JetDirect's management to properly collect and account for financial data from JetDirect's subsidiaries.

JetDirect's internal control deficiencies were exacerbated when senior management attempted to consolidate the Company's billing operations. The project was botched, and JetDirect's billing cycle expanded dramatically. Accounts receivable increased more than six-fold, and it took up to sixteen weeks to gather financial data to report to the board.

In April 2007, CML loaned JetDirect $25,743,912, an amount later increased to $34,243,912. Despite lacking current information about JetDirect's financial condition, the Company's board approved four major acquisitions in late 2007. CML contends that if JetDirect's managers had possessed accurate financial data, they would have seen that JetDirect lacked the working capital to finance the acquisitions. CML also contends that senior management hid adverse information from the board.

In June 2007, JetDirect defaulted on its loan obligations to CML. By January 2008, JetDirect was insolvent. In late 2008, JetDirect's managers began liquidating some of JetDirect's holdings. According to CML, certain managers negotiated sales of JetDirect assets to entities they controlled, and the JetDirect board approved the interested sales without adequately reviewing their fairness.

### B. The Claims

Based on these allegations, CML asserts derivatively in Count I that the Individual Defendants breached their duty of care by approving the late 2007 acquisitions without informing themselves of critical information about JetDirect's financial condition. CML asserts derivatively in Count II that the Individual Defendants acted in bad faith by consciously failing to implement and monitor an adequate system of internal controls. Count II also alleges that a member of senior management hid critical information from the board. CML asserts derivatively in Count III that the Individual Defendants who benefited from the self-interested asset sales breached their duty of loyalty. In Count IV, CML asserts a direct claim against JetDirect for breach of its loan agreement with CML. If Counts I–III are successful, the Individual Defendants will pay damages to JetDirect, and CML can recover those funds under Count IV.

### II. LEGAL ANALYSIS

"[T]he creditors of an *insolvent* corporation have standing to maintain derivative claims against directors on behalf of the corporation for breaches of fiduciary duties." *N. Am. Catholic Educ. Programming Found., Inc. v. Gheewalla*, 930 A.2d 92, 101 (Del.2007) [hereinafter, "*Gheewalla*"]; accord *Prod. Res. Gp., L.L.C. v. NCT Gp., Inc.*, 863 A.2d 772, 776 (Del.Ch. 2004). When a corporation is insolvent, the creditors become "the principal constituency injured by any fiduciary breaches that diminish the firm's value." *Gheewalla*, 930 A.2d at 102 (quoting *Prod. Res.*, 863 A.2d at 792). Under these circumstances, "equitable considerations give creditors standing to pursue derivative claims

against the directors of an insolvent corporation." *Id.*

■ CML argues that the same equitable considerations entitle creditors to sue derivatively on behalf of an insolvent LLC. The Individual Defendants respond that the LLC Act precludes creditor standing. As demonstrated by this Court's decisions and scholarly commentary, the standing provisions in the alternative entity statutes have not been widely understood as barring derivative claims by creditors of an insolvent entity. To the contrary, many have assumed that creditor derivative standing exists. Nevertheless, the literal terms of the LLC Act control, and they bar a creditor of an insolvent LLC from suing derivatively. Although this Court may depart from the literal reading of a statute where such a reading is so inconsistent with the statutory purpose as to produce an absurd result, this is not such a case.

### A. The Plain Language Of The LLC Act

" '[A] statute, clear and unambiguous on its face, need not and cannot be interpreted by a court....' " *Harrigan v. City of Wilm.*, 2006 WL 258061, at *3 (Del.Super. Jan. 5, 2006) (quoting Norman J. Singer, *Sutherland on Statutory Construction* § 45.02 (6th ed. 2000)). "If the statute as a whole is unambiguous, there is no reasonable doubt as to the meaning of the words used and the Court's role is then limited to an application of the literal meaning of the words." *Coastal Barge Corp. v. Coastal Zone Indus. Control Bd.*, 492 A.2d 1242, 1246 (Del.1985).

The LLC Act creates a statutory right to bring a derivative action. Section 18–1001, entitled "Right to Bring Action," states: "A member or an assignee of a limited liability company interest may bring an action in the Court of Chancery in the right of a limited liability company to recover a judgment in its favor if managers or members with authority to do so have refused to bring the action or if an effort to cause those managers or members to bring the action is not likely to succeed." 6 *Del. C.* § 18–1001. The following section, entitled "Proper Plaintiff," provides:

> In a derivative action, the plaintiff must be a member or an assignee of a limited liability company interest at the time of bringing the action and: (1) At the time of the transaction of which the plaintiff complains; or (2) The plaintiff's status as a member or an assignee of a limited liability company interest had devolved upon the plaintiff by operation of law or pursuant to the terms of a limited liability company agreement from a person who was a member or an assignee of a limited liability company interest at the time of the transaction.

6 *Del. C.* § 18–1002.

Under the plain language of Section 18–1002, a plaintiff "must be a member or an assignee." Section 18–1001 similarly refers only to "a member or an assignee." The only Delaware treatise to comment directly on how these provisions affect creditors states: "Under Sections 18–1001 and 18–1002, [an LLC] creditor is not a proper plaintiff in a derivative suit." Robert L. Symonds, Jr. & Matthew J. O'Toole, *Delaware Limited Liability Companies* § 9.09, at 9–61 n.270 (2007).

The United States District Court for the District of Delaware implicitly reached the same conclusion when applying the Montana LLC Act, which has a provision comparable to Section 18–1002. *See Magten Asset Mgmt. Corp. v. Paul Hastings Janofsky & Walker LLP*, 2007 WL 129003, at *3 (D.Del. Jan. 12, 2007). Interpreting that provision, the district court com-

mented that a derivative claim "may only be brought by [a] member of the company, who was a member at the time of the transaction." *Id.* On that basis, the district court rejected the possibility that a creditor plaintiff had statutory standing and turned to the plaintiff's alternative argument that it had derivative standing under an indenture, which the court also rejected. *Id.*

The exclusive language of Section 18–1002 contrasts with the non-exclusive language of Section 327 of the Delaware General Corporation Law (the "DGCL"), 8 *Del. C.* § 327. Section 327 is the only provision in the DGCL that addresses derivative actions. 2 Edward P. Welch, et al., *Folk on the Delaware General Corporation Law* § 327.1, at GCL–XIII–42 (5th ed. 2010). It provides: "In any derivative suit instituted by a stockholder of a corporation, it shall be averred in the complaint that the plaintiff was a stockholder of the corporation at the time of the transaction of which such stockholder complains or that such stockholder's stock thereafter devolved upon such stockholder by operation of law." 8 Del. C. § 327.

The Delaware Supreme Court and this Court have recognized that Section 327 does not create the right to sue derivatively and, by its terms, does not say that only stockholders can sue derivatively. *See Schoon v. Smith,* 953 A.2d 196, 204 (Del. 2008); *Harff v. Kerkorian,* 324 A.2d 215, 219 (Del.Ch.1974), *aff'd in relevant part, rev'd in part,* 347 A.2d 133 (Del.1975). Instead, it limits the subset of derivative suits "instituted by a stockholder of the corporation" by requiring that a stockholder plaintiff satisfy the contemporaneous ownership requirement. 8 *Del. C.* § 327.[1] Section 327 demonstrates that the General Assembly can readily adopt a non-exclusive limitation on derivative standing. Section 18–1002, by contrast, uses exclusive language.

Under the plain language of Section 18–1002, standing to bring a derivative action is limited to "a member or an assignee." Read literally, Section 18–1002 denies derivative standing to creditors of an insolvent LLC.

## B. A Dog That Has Not Barked

As compelling as a literal reading of Section 18–1002 might seem, it encounters an awkward fact: Despite the ostensibly obvious implications of the statute, virtually no one has construed the derivative standing provisions as barring creditors of an insolvent LLC from filing suit. Particularly in light of *Production Resources* and *Gheewalla,* an exclusive reading of Section 18–1002 would cause LLC derivative actions to differ markedly from their corporate cousins. If practitioners widely understood the derivative standing provisions to have this effect, one would expect treatises, articles, and commentaries to call attention to that fact. *See Sun–Times Media Gp., Inc. v. Black,* 954 A.2d 380, 399–400 (Del.Ch.2008) (noting that absence of authoritative commentary addressing plaintiffs' reading of statute suggested that "everyone understood" meaning to be otherwise). In the years since *Production Resources* and *Gheewalla,* one also would

1. Elsewhere I have criticized the contemporaneous ownership requirement as "fundamentally incoherent," "ill-suited to each of the purposes advanced to support it," "[o]perat[ing] largely at random [to] arbitrarily mandate[ ] the dismissal of potentially meritorious claims," and "unnecessary, as defendants already have numerous avenues to dispose of meritless derivative actions." J. Travis Laster, *Goodbye to the Contemporaneous Ownership Requirement,* 33 Del. J. Corp. L. 673, 673 (2008). My personal views do not change the fact that Section 327 is part of the DGCL. Unless Section 327 is amended, the contemporaneous ownership requirement remains the law of Delaware.

expect courts to have encountered parties raising the statutory provisions as a defense. Yet the universe of authorities favoring the no-standing position consists of (i) a single sentence at the end of a footnote in one Delaware treatise, *see* Symonds & O'Toole, *supra*, § 9.09, at 9–61 n.270, and (ii) abbreviated treatment in an unreported district court decision, *see Magten*, 2007 WL 129003, at *3.

Many commentators, by contrast, have assumed that creditors of an insolvent LLC can sue derivatively. In light of this assumption, they have debated vigorously whether an LLC agreement can limit the fiduciary duties that the creditors would invoke.[2] That question never arises if creditors lack standing to sue under Section 18–1002.

Moreover, two decisions of this Court have assumed, implicitly, that a creditor of an insolvent alternative entity can sue derivatively for breach of fiduciary duty. *See Vichi v. Koninklijke Philips Electronics N.V.*, 2009 WL 4345724 (Del.Ch. Dec. 1, 2009); *Bren v. Capital Realty Gp. Senior Housing, Inc.*, 2004 WL 370214 (Del.Ch. Feb. 27, 2004). In *Vichi*, this Court stated:

> The Supreme Court has held unequivocally [in *Gheewalla* ] that "[t]he creditors of a Delaware corporation that is either insolvent or in the zone of insolvency have no right, as a matter of law, to assert direct claims for breach of fiduciary duty...." Furthermore, "case law governing [standing for] corporate derivative suits is equally applicable to suits on behalf of an LLC." Therefore, following the reasoning in *Gheewalla*, creditors of an LLC that is either insolvent or in the zone of insolvency cannot, as a matter of law, bring a direct suit for

---

**2.** *See, e.g.*, Royce De R. Barondes et al., *Twilight in the Zone of Insolvency: Fiduciary Duty and Creditors of Troubled Companies*, 1 J. Bus. & Tech. L. 229, 249 (2007) (panel discussion; Prof. Lawrence Hamermesh: "[I]f 102(b)(7) is brought back into the picture, what is going to be the role not for director's duties to creditors, but for the duties of managers of LLC's [sic] to creditors, when LLC agreements can operate much more actively in defining or eliminating fiduciary duty altogether? That to me is a very interesting topic."); *Id.* at 251 (Prof. Larry Ribstein: "I also wanted to talk for a second about Larry Hamermesh's question about what Vice Chancellor Strine's reference to 102(b)(7) [in *Production Resources* ] would mean for the complete act in Delaware for LLCs and partnerships. One answer is that it will give people an opportunity to contract around any fiduciary duties to creditors, effectively contract around any fiduciary duties to creditors if the court found them to exist, which I do not think they do."); Andrew S. Gold, *On the Elimination of Fiduciary Duties: A Theory of Good Faith For Unincorporated Firms*, 41 Wake Forest L.Rev. 123, 176–77 (2006) (arguing in favor of standardized language for limiting liability for fiduciary duties in LLC membership agreements because, *in-*

*ter alia*, "[o]ther limited partnerships and LLCs benefit from standardized terms already in use, as do creditors and third party entrants to the business relationship. Third party rights are substantially affected by the predictability of judicial interpretations of intrafirm obligations, but as with courts, third parties are not in a position to readily access the background negotiations that produced the express terms."); Mark M. Maloney & Michelle L. Carter, *Asserting Breach–of–Fiduciary–Duty Claims in the Context of Delaware LLCs*, Am. Bankr.Inst. J., Vol. XXVII No. 7, at 36 (Sept. 2009) ("Assuming a suitably drafted LLC agreement is in place, the members of an LLC will have no ability to assert breach-of-fiduciary-duty claims against the LLC's managers. In *that* scenario, how could creditors ever have a derivative right to assert fiduciary duty claims?"); Myron M. Sheinfeld & Judy Harris Pippitt, *Fiduciary Duties of Directors of a Corporation in the Vicinity of Insolvency and After Initiation of a Bankruptcy Case*, 60 Bus. Law. 79, 87 (2004) ("[I]f a partnership agreement or limited liability company agreement eliminates liability for partners' and members' breach of fiduciary duties to the limited partnership or limited liability company, then are creditors' derivative rights to sue for such breaches also eliminated?").

breach of fiduciary duty. Accordingly, if Vichi's claims are, in fact, direct, then they must fail.

2009 WL 4345724, at *20 (footnotes omitted) (quoting *Gheewalla*, 930 A.2d at 103, and *VGS Inc. v. Castiel*, 2003 WL 723285, at *11 (Del.Ch. Feb. 28, 2003)). The Court analyzed the creditor's claims and concluded that they were direct, not derivative, mooting the question of derivative standing. The underlying briefs show that the defendants argued that Section 18–1002 denied derivative standing to creditors as a matter of law. Although the Court did not reach the issue, the quoted passage seems to assume that creditor standing under *Gheewalla* extends to LLCs.

*Bren* reflects a similar assumption. The creditor of an insolvent limited partnership sued the general partner derivatively for neglecting to file a lawsuit challenging a related party transaction. As discussed below, the limited partnership derivative standing provisions are substantively identical to the LLC Act provisions. The general partner in *Bren* responded that the claim was barred by the three-year statute of limitations. The plaintiff countered that the limitations period could not run against creditors until the entity became insolvent, because creditors lacked standing to sue until then. This Court dismissed the claim as time-barred, holding that the limitations period ran from the date of injury to the entity, not from the date any particular plaintiff gained standing. In reaching this conclusion, the Court assumed that a creditor would acquire standing to sue derivatively once the entity became insolvent, but lacked standing prior to that point. *See Bren*, 2004 WL 370214, at *4.

Neither *Vichi* nor *Bren* specifically interpreted the statutory derivative standing provisions. In *Bren*, the statutory argument was not raised. In *Vichi*, it was not reached. In neither case was standing dis-positive, rendering both discussions *dicta*. Nevertheless, each decision assumed that alternative entity creditors could sue derivatively after insolvency. Like the telling absence of prominent commentary, the two decisions indicate that the derivative standing provisions are not generally understood as imposing a statutory bar against derivative actions by creditors of an insolvent entity.

## C.  Other Sources Of Authority

Delaware Supreme Court decisions empower this Court to resolve any apparent tension between the plain language of the LLC Act and the commonly held understanding of the provisions decisively in favor of the statutory language. "If a statute is unambiguous, there is no need for judicial interpretation, and the plain meaning of the statutory language controls." *Eliason v. Englehart*, 733 A.2d 944, 946 (Del.1999). "[W]here the language of a statute is plain and conveys a clear and definite meaning, the courts will give to the statute the exact meaning conveyed by the language, adding nothing thereto, and taking nothing therefrom." *Fed. United Corp. v. Havender*, 11 A.2d 331, 337 (Del.1940). The derivative standing provisions of the LLC Act, however, are not uniquely Delawarean provisions, nor are they artifacts of the LLC statute. Rather they are part of widely adopted uniform acts where consistent interpretation and stable commercial expectations have particular salience. A context-free reading of those provisions risks a content-skewed result. Although I could resolve this case on plain meaning alone, I also have considered (i) how parallel provisions of other alternative entity statutes have been interpreted, (ii) the source and development of the alternative entity derivative standing provisions, and (iii) whether enforcing the plain meaning of Section 18–1002 would create an absurd

result at odds with the overarching purpose and framework of the LLC Act. Each line of inquiry supports applying Section 18–1002 as an exclusive provision that limits derivative standing to LLC members and assignees.

### 1. The Comparable Provisions Of The LP Act

The Delaware Limited Partnership ("LP") Act contains derivative standing provisions phrased identically to Sections 18–1001 and 18–1002, except for substituting terms relevant to the entity covered, such as "partner" and "limited partnership" for "member" and "limited liability company." *See* 6 Del. C. §§ 17–1001 & 17–1002.[3] This comes as no surprise. The LLC Act was "modeled on the popular Delaware LP Act." *Elf Atochem N. Am., Inc. v. Jaffari,* 727 A.2d 286, 290 (Del. 1999). "In fact, its architecture and much of its wording is almost identical to that of the Delaware LP Act." *Id.*

In framing derivative standing in exclusive terms, Sections 17–1001 and 17–1002 of the Delaware LP Act track the comparable derivative action provisions in the Revised Uniform Limited Partnership Act ("RULPA"). A leading treatise on RULPA regards the derivative standing provisions as exclusive: "A person must be a limited partner to bring a derivative suit under R.U.L.P.A. § 1001. R.U.L.P.A. § 1002 restates this requirement ('must be a partner at the time of bringing the action')...." Alan R. Bromberg & Larry E. Ribstein, 4 *Bromberg and Ribstein on Partnership* § 15.05(g), at 15:67 (2010–2 Supp.).[4]

This Court previously has interpreted the LP Act's derivative standing provisions as exclusive. In 1998, Sections 17–1001

---

**3.** Section 17–1001 states: "A limited partner or an assignee of a partnership interest may bring an action in the Court of Chancery in the right of a limited partnership to recover a judgment in its favor if general partners with authority to do so have refused to bring the action or if an effort to cause those general partners to bring the action is not likely to succeed." 6 *Del. C.* § 17–1001. Section 17–1002 states: "In a derivative action, the plaintiff must be a partner or an assignee of a partnership interest at the time of bringing the action and: (1) At the time of the transaction of which the plaintiff complains; or (2) The plaintiff's status as a partner or an assignee of a partnership interest had devolved upon the plaintiff by operation of law or pursuant to the terms of the partnership agreement from a person who was a partner or an assignee of a partnership interest at the time of the transaction." 6 *Del. C.* § 17–1002.

**4.** The Delaware commentaries are more guarded. The authoritative Delaware treatise on the LP Act states only that "[a]ssuming that certain statutory conditions ... are satisfied, a limited partner or an assignee of a partnership interest has the right to bring a derivative action." Martin I. Lubaroff & Paul M. Altman, *Delaware Limited Partnerships* § 10.1, at 10–1 (2007 Supp.). Later, the authors write that "[t]he Act sets forth ownership requirements that are designed to prevent derivative actions by a limited partner or assignee of a partnership interest challenging transactions that occurred prior to the limited partner becoming a limited partner of a limited partnership or an assignee of a partnership interest becoming an assignee." *Id.* § 10.2, at 10–6.2. In each case, the treatise appears to be paraphrasing the statute, and it is not apparent that the authors embrace an exclusive reading of the provisions. The authoritative Delaware treatise on Court of Chancery practice refers to the alternative entity standing provisions and notes departures from the traditional corporate rules, but does not suggest that the standing provisions are exclusive. *See* Donald J. Wolfe, Jr. & Michael A. Pittenger, *Corporate and Commercial Practice in the Delaware Court of Chancery* § 9.02[c][1], at 9–123 to 9–132 (Supp.2010). Although the Symonds & O'Toole treatise regards the standing provisions as barring creditor derivative suits, it says so in a single sentence at the end of a footnote and without discussion or analysis. *See* Symonds & O'Toole, *supra,* § 9.09, at 9–61 n.270. It does not trumpet the interpretation.

and 17–1002 of the LP Act and Sections 18–1001 and 18–1002 of the LLC Act were amended to authorize assignees of LP or LLC interests to sue derivatively. 71 Del. Laws ch. 340 §§ 17, 18 (1998) (amending LP Act); 71 Del. Laws ch. 341 §§ 16, 17 (1998) (amending LLC Act). Prior to the amendment, Sections 17–1001 and 17–1002 were read strictly to bar suits by assignees. *See Vanderbilt Income & Growth Assocs., L.L.C. v. Arvida/JMB Managers, Inc.*, 1996 WL 652773, at *1 (Del.Ch. Nov. 4, 1996) ("Since the plaintiffs are not limited partners, they may not bring a derivative action. 6 Del. C. § 17–1001."), *rev'd on other grounds*, 691 A.2d 609 (Del.1996); *U–H Acq. Co. v. Barbo*, 1994 WL 34688, at *4 (Del.Ch. Jan. 31, 1994) (holding that tender offeror and assignee of LP interest could not satisfy Section 17–1002). According to a treatise on RULPA, without the additional language, "[a]n assignee of a limited partnership interest as such cannot maintain a derivative suit … since he or she is not a limited partner." Bromberg and Ribstein, *supra*, § 15.05(g), at 15:68.1.

Like the derivative standing provisions in the LLC Act, the comparable derivative standing provisions in the LP Act facially bar any party other than a limited partner or assignee from suing derivatively. Read literally, the provisions prevent creditors from suing, and the Delaware courts historically have interpreted them as exclu-

sive. This treatment strongly supports a similarly exclusive reading of the LLC Act.

### 2. Statutory Origins

The origins of Delaware's alternative entity standing provisions suggest an affirmative decision to make the provisions exclusive. When the General Assembly passed the LLC Act in 1992, it adopted the established derivative standing provisions from the LP Act. The LP Act's provisions have a longer and more informative history.

The debate over limited partner derivative standing dates back over a century. In 1822, New York adopted the country's first limited partnership statute. *See* Edwin W. Hecker, Jr., *Limited Partners' Derivative Suits Under the Revised Uniform Limited Partnership Act*, 33 Vand. L.Rev. 343, 343 (1980) (citing 1822 N.Y. Laws, ch. 244). In 1916, the National Conference of Commissioners on Uniform State Laws ("NCCUSL") promulgated the original Uniform Limited Partnership Act ("ULPA"). *Id.* Every state except Louisiana eventually adopted it in some form, with Delaware following suit in 1973. *See* Joseph J. Basile, Jr., *The 1985 Delaware Revised Uniform Limited Partnership Act*, 41 Bus. Law. 571, 571 (1986).

ULPA did not explicitly authorize derivative actions, and courts split on whether a limited partner could sue derivatively.[5] The majority rule recognized that limited

---

5. *See generally Allright Missouri, Inc. v. Billeter*, 829 F.2d 631, 636–38 (8th Cir.1987) (describing split and adopting majority rule); Edwin W. Hecker, Jr., *Limited Partners' Derivative Suits Under The Revised Uniform Limited Partnership Act*, 33 Vand. L.Rev. 343, 346–55 (1980) (tracing development of case law); Mary E. Brumder, Comment, *Investor Protection and the Revised Uniform Limited Partnership Act*, 56 Wash. L.Rev. 99, 111–12 (1980) (describing limited partner derivative remedy as "unreliable" in light of conflicting decisions); Note, *Procedures and Remedies in Lim-

ited Partners' Suits for Breach of the General Partner's Fiduciary Duty*, 90 Harv. L.Rev. 763, 770–77 (1977) (describing split and arguing for limited partner derivative standing); Comment, *Standing of Limited Partners to Sue Derivatively*, 65 Colum L.Rev. 1463, 1486–87 (1965) (noting uncertainty over limited partner derivative standing and arguing in favor of standing); Debra E. Wax, Annotation, *Right of Limited Partner to Maintain Derivative Action on Behalf of Partnership*, 26 A.L.R.4th 264 (1983 & Supp.) (collecting cases and describing split).

partners could sue derivatively by analogizing them to stockholders and trust beneficiaries.[6] A to-and-fro among the courts in New York shows how deep the conflict ran. A federal district court first rejected derivative standing under New York law, but the Second Circuit reversed. The state courts then rejected derivative standing yet again, only to have the New York Court of Appeals agree with the Second Circuit.[7]

In 1973, Delaware was the last state to adopt ULPA. While taking much from the uniform act, the Delaware drafters included a number of unique provisions, including express statutory authorization for limited partner derivative actions. *See generally* Basile, *supra*, at 571–72; 64 Del. Laws ch. 105, § 1732 (1973). Section 1732 of the original LP Act stated:

> **Limited partners' derivative action brought in the right of a limited partnership to procure a judgment in its favor.**
>
> (a) An action may be brought in the right of a limited partnership to procure a judgment in its favor by a limited partner.
>
> (b) In any such action, it shall be made to appear that at least one plaintiff is such a limited partner at the time of bringing the action, and that he was such at the time of the transaction of which he complains, or that his status as limited partner devolved upon him by operation of law or pursuant to the

> terms of the certificate of limited partnership or written partnership agreement in effect at the time of the transaction of which he complains.
>
> (c) In any such action, the complaint shall set forth with particularity the efforts of the plaintiff to secure the initiation of such action by the general partner or partners, or the reasons for not making such effort.
>
> (d) If the action on behalf of the limited partnership was successful, in whole or in part, ... the court may award the plaintiff or plaintiffs ... reasonable expenses, including reasonable attorneys' fees....

64 Del. Laws ch. 105, § 1732 (1973).

Comparing Section 1732 of the LP Act with Section 327 of the DGCL reveals close parallels. Both are non-exclusive statutes. Section 1732(a) establishes a non-exclusive right of a limited partner to sue derivatively ("An action *may* be brought in the right of a limited partnership to procure a judgment in its favor by a limited partner."). In language paralleling Section 327, Section 1732(b) then provides that "[i]n any such action"—*i.e.*, an action in which the plaintiff is a limited partner—the contemporaneous ownership requirement must be met. Delaware's original foray into derivative standing for alternative entities thus tracked Section 327, authorized limited partner derivative actions and imposed restrictions on them,

---

6. *See, e.g., Klebanow v. New York Produce Exch.*, 344 F.2d 294, 297–300 (2d. Cir.1965) (Friendly, J.). *See generally* Wax, 26 A.L.R.4th at 264 (collecting cases).

7. *See* B. Troy Villa, *The Status of Enforcing Fiduciary Duties in a Limited Partnership after Dupuis v. Becnel Co.*, 49 La. L.Rev. 1217, 1218–22 (1989) (recounting saga in New York courts); Note, *supra* note 5, at 771–74 (same). When New York adopted an LLC statute, the

saga repeated itself. The statute did not provide specifically for derivative actions by LLC members, and lower courts split over whether an LLC member could sue derivatively. The New York Court of Appeals ultimately resolved the question in favor of derivative standing. *See* Larry E. Ribstein & Robert R. Keatinge, 1 *Limited Liability Companies* § 10:3, at 597 n.7 (2010) (discussing "[t]he odyssey in the New York courts").

but did not otherwise purport to limit who could sue derivatively.

In 1976, NCCUSL promulgated RULPA, which was "intended to modernize the prior uniform law while retaining the special character of limited partnerships." Revised Unif. Ltd. P'ship Act of 1976 Prefatory Note (Amended 1985), 6B U.L.A. 3 [hereinafter "RULPA"]. Following Delaware's example, RULPA added provisions addressing a limited partner's right to maintain a derivative action, which became RULPA Sections 1001 to 1004. *See* Hecker, *supra*, at 355. Section 1001, entitled "Right of Action," stated:

> A limited partner may bring an action in the right of a limited partnership to recover a judgment in its favor if general partners with authority to do so have refused to bring the action or if an effort to cause those general partners to bring the action is not likely to succeed.

RULPA, *supra*, § 1001, 6B U.L.A. 370. Section 1002, entitled "Proper Plaintiff," provided:

> In a derivative action, the plaintiff must be a partner at the time of bringing the action and (i) at the time of the transaction of which he complains or (ii) his status as a partner had devolved upon him by operation of law or pursuant to the terms of the partnership agreement from a person who was a partner at the time of the transaction.

RULPA, *supra*, § 1002, 6B U.L.A. 378. NCCUSL's derivative standing provisions mark the first use of exclusive language.

I have not been able to discern why NCCUSL drafted the derivative standing provisions in this fashion. The prefatory note to the 1976 version of RULPA states simply that "Article 10 of the Act authorizes derivative actions to be brought by limited partners." RULPA, *supra*, Prefatory Note, 6B U.L.A. 5. The commentary to Sections 1001 and 1002 remarks only that the respective sections are "new." RULPA, *supra*, §§ 1001, 1002, 6B U.L.A. 370, 378.

To a reader aware of Section 327 and the contemporaneous ownership requirement, it is not immediately clear that NCCUSL intended Sections 1001 and 1002 to be exclusive. Read literally, Section 1001 is not exclusive. It states only that "[a] limited partner *may* bring an action in the right of a limited partnership." It does not say that no one else can sue in the name of the limited partnership, only that a limited partner *may* sue if the general partners with authority to sue have refused, or if efforts to make them sue would not be likely to succeed. If anything, Section 1001 appears geared towards adopting the corporate requirement of demand futility. Section 1002 follows immediately after Section 1001 and limits the circumstances under which a partner can sue by imposing the contemporaneous ownership requirement. Although it stated that a plaintiff "must be a partner," Section 1002 focuses principally on the *timing* of ownership. Of the section's 66 words, 56 address this subject.[8]

Given the close connection between Sections 1001 and 1002 and the obvious intent to transplant the demand and contemporaneous ownership requirements into the LP corpus, one could readily imagine that the NCCUSL scribes did not consciously intend to change the rules of derivative standing. They simply may have wanted a straightforward, actively voiced provision. In other words, rather than pondering the subtleties of standing, they may have been

---

8. In making this observation, I count all of the text beginning with "at the time of bring-ing the action" and running through the end of the provision.

heeding the guidance of grammarians.[9]

When presented with NCCUSL's work, however, the architects of the Delaware LP Act faced a clear choice. Unlike NCCUSL, which was writing on a blank ·slate, the LP Act already had a derivative action standing provision. Section 1732 was non-exclusive and closely tracked Section 327. The drafters did not have to go the RULPA route. When they presented Delaware's proposed version of RULPA to the General Assembly in 1982, it again included uniquely Delawarean sections. *See* Basile, *supra*, at 592. Yet the drafters chose to replace Section 1732 with the facially exclusive RULPA versions. In New York, the only other jurisdiction with a pre-RULPA derivative standing provision, the legislators retained their non-exclusive language. *See* N.Y. P'ship Law § 115–a. At least for Delaware, the decision to implement the RULPA provisions suggests a conscious intent to make statutory standing exclusive.

### 3. No Statutory Conflict

CML argues that I should disregard the literal language of Section 18–1002 because, under Delaware Supreme Court precedent, a statute will be deemed ambiguous "if a literal reading of the statute would lead to an unreasonable or absurd result not contemplated by the legislature." *LeVan v. Independence Mall, Inc.,* 940 A.2d 929, 933 (Del.2007) (quoting *Newtowne Vill. Serv. Corp. v. Newtowne Rd. Dev. Co.,* 772 A.2d 172, 175 (Del.2001)); *accord Snyder v. Andrews,* 708 A.2d 237, 241 (Del.1998) ("A statute also may be found to be ambiguous if a literal interpretation of the words of the statute would lead to a result so unreasonable or absurd that it could not have been intended by the legislature."). In addition, "the literal meaning of a statute is not to be followed when it departs from the true intent and purpose of the statute and to conclusions inconsistent with the general purpose of the act." *In re Opinions of the Justices,* 88 A.2d 128, 134 (Del.1952); *accord Darling Apartment Co. v. Springer,* 22 A.2d 397, 402 (Del.1941). CML argues that a plain reading of Section 18–1002 generates an absurd distinction between insolvent corporations, where creditors can sue derivatively, and insolvent LLCs, where they cannot. CML further contends that Sections 18–1001 and 18–1002 were so clearly intended to transport the demand and contemporaneous ownership requirements into the world of LLCs that it would be inconsistent with that more limited purpose to apply the statute more broadly as an exclusive provision.

■ I cannot agree. As a threshold matter, there is nothing absurd about different legal principles applying to corporations and LLCs. "Because the conceptual

**9.** *E.g.,* Stephen V. Armstrong & Timothy P. Terrell, *Thinking Like a Writer* 222 (2d ed. 2003) ("Passive voice has two primary disadvantages ... it can blur the clarity of the action ... [and] it may lead to ambiguity because the agent can disappear from the sentence altogether."); Roy Peter Clark, *The Glamour of Grammar* 167 (2010) ("Writers have traditionally expressed a preference for active verbs.... Active sentences tend to be shorter and more direct than passive ones."); Bryan A. Garner, *The Elements of Legal Style* 41 (2d ed. 2002) ("The English-speaking reader expects a true sequence in actor, action, and recipient—as opposed to an inverted sequence.... Typically, changing a passive voice to active saves words and makes reading easier...."); C. Edward Good, *Who's (... oops!) Whose Grammar Book Is This Anyway?* 232 (2002) ("Favor the active over the passive unless you can find a good reason not to."); William Strunk, Jr., & E.B. White, *The Elements of Style* 18 (4th ed. 2000) ("The active voice is usually more direct and vigorous than the passive.... The habitual use of the active voice ... makes for forcible writing.").

underpinnings of the corporation law and Delaware's [alternative entity] law are different, courts should be wary of uncritically importing requirements from the DGCL into the [alternative entity] context." *Twin Bridges Ltd. P'ship v. Draper*, 2007 WL 2744609, at *19 (Del.Ch. Sept. 14, 2007) (discussing limited partnership).

I also cannot conclude that the derivative standing provisions were adopted solely to transpose the corporate demand and contemporaneous ownership tunes into an alternative entity key. Delaware's decision to replace Section 1732 with the RULPA provisions suggests an intent to make standing exclusive, and this is how the provisions subsequently were interpreted when LP assignees attempted to sue. When the alternative entity statutes were amended in 1998, the drafters could have returned to the open-ended language of the Section 1732. The evolution of Delaware's derivative standing provisions suggests a conscious decision to make the statutes exclusive.

■ Nor does barring creditor derivative standing conflict with the overarching purpose or structure of the LLC Act. According to the LLC Act itself, "[i]t is the policy of this chapter to give the maximum effect to the principle of freedom of contract and to the enforceability of limited liability company agreements." 6 Del. C. § 18–1101(b). LLCs "are creatures of contract, 'designed to afford the maximum amount of freedom of contract, private ordering and flexibility to the parties involved.'" *TravelCenters of Am., LLC v. Brog*, 2008 WL 1746987, at *1 (Del.Ch. Apr. 3, 2008) (quoting *In re Grupo Dos Chiles, LLC*, 2006 WL 668443, at *2 (Del. Ch. Mar. 10, 2006)). Creditors generally are presumed to be "capable of protecting themselves through the contractual agreements that govern their relationships with firms." *Prod. Res.*, 863 A.2d at 787.

"Creditors are often protected by strong covenants, liens on assets, and other negotiated contractual protections." *Id.* at 790. To limit creditors to their bargained-for rights and deny them the additional right to sue derivatively on behalf of an insolvent entity comports with the contractarian environment created by the LLC Act.

The LLC Act includes specific statutory features that appear designed (at least in part) with creditors in mind, and which creditors can use to obtain additional rights and protections. First, the LLC Act authorizes an LLC agreement to "provide rights to any person, including a person who is not a party to the [LLC] agreement, to the extent set forth therein." 6 *Del. C.* § 18–101(7). A creditor therefore can bargain for express contractual rights in the LLC agreement while remaining a non-party to the agreement. As the leading Delaware LLC treatise explains,

Rights provided to a non-party company creditor under the [LLC] agreement may be ancillary to and protective of a claim of that creditor arising from a separate, perhaps related contract or transaction. A third party lender's right to repayment of funds loaned to [an LLC], for example, generally arises under a contract other than the [LLC] agreement. The [LLC] agreement, however, may contain terms designed to diminish the likelihood that the company will default on its payment obligations to the lender. Such contractual provisions might prohibit the company, during the term of the loan, from making a distribution, incurring additional indebtedness, or taking other action that may increase the lender's risk of non-payment; alternatively, these activities may be permitted but made subject to the lender's prior consent or some other constraint. The enforceability of these and similar terms in the [LLC] agree-

ment is supported by the DLLC Act's broad authorization for granting third-party rights in that agreement.

Symonds & O'Toole, *supra*, § 15.01, at 15–4 (footnotes omitted).

Creditors also can use Section 18–101(7) in other ways. In a departure from the contract law rule against penalty clauses, Section 18–306 of the LLC Act provides that members may be subjected "to specified penalties or specified consequences" for breaching the LLC Agreement or "[a]t the time or upon the happening of events specified in the [LLC] agreement." 6 Del. C. § 18–306. Combining this authority with Section 18–101(7) enables creditors to bargain for penalties and consequences for members upon the occurrence of specific events or if creditors' rights are breached. Other LLC Act provisions offer similar points of entry for creditor protections. *See, e.g.*, 6 Del. C. § 18–402 ("Unless otherwise provided in [an LLC] agreement, the management of [an LLC] shall be vested in its members.... [A] manager shall cease to be a manager as provided in [an LLC] agreement.").

Second, Section 18–1101 enables creditors to expand their available remedies. Under Section 18–1101(c), "[t]o the extent that, at law or in equity, a member or manager ... has duties (including fiduciary duties) to a limited liability company ..., the ... duties may be *expanded* or restricted or eliminated by provisions in the [LLC] agreement." 6 Del. C. § 18–1101(c) (emphasis added). Although typically cited for authorizing the restriction or elimination of legal duties, this section likewise authorizes the expansion of legal duties. An LLC agreement conceivably could provide for duties triggered by insolvency that would include an obligation to preserve assets for creditors. If a creditor is willing to become a party to the LLC agreement, then it might be able to make

creative use of Section 18–1101(c) of the LLC Act.

Third, other provisions of the LLC Act offer creditors additional opportunities to secure protection. Section 18–303(b) provides that notwithstanding the general protection of limited liability provided by the LLC Act, a member or manager may agree in the LLC agreement "or under another agreement" to be "obligated personally for any or all of the debts, obligations and liability of the limited liability company." 6 *Del. C.* § 18–303(b). This provision could be used in lieu of or to supplement personal guarantees for a particular debt. Similarly, Section 18–215 authorizes an LLC agreement to "establish or provide for the establishment of 1 or more designated series of ... [LLC] ... assets" that may carry "separate rights, powers or duties with respect to specified property or obligations of the [LLC] or profits and losses associated with specified property or obligations." 6 *Del. C.* § 18–215(a) & (b). This provision could be used in lieu of or to supplement security interests in a particular asset.

In each of these cases, a creditor can protect its enhanced rights through a provision conditioning the approval of any amendment to the LLC agreement on creditor consent or the satisfaction of conditions. *See* 6 *Del. C.* § 18–302(e) ("If [an LLC] agreement provides for the manner in which it may be amended, including by requiring the approval of a person who is not a party to the [LLC] agreement or the satisfaction of conditions, it may be amended only in that manner or as otherwise permitted by law....."). The leading LLC treatise describes how this statutory authority can be used.

> For example, the [LLC] agreement may limit the purposes, powers, and activities of the company in a manner that tends to reduce potential risks for a particular

creditor of the company.... If the agreement requires that one or more non-parties, such as a company creditor, must approve an amendment of such terms, then that amendment cannot be validly effected except in accordance with that requirement or otherwise in accordance with the statute. Similarly, for the benefit of a holder of bonds, notes or other indebtedness issued by the [LLC], the validity of an amendment to its [LLC] agreement may be made dependent on satisfaction of a so-called rating agency condition. Such a condition may take the form of a requirement that a rating agency will not, as a consequence of a proposed amendment to the [LLC] agreement, withdraw or negatively adjust its rating of indebtedness issued by the company.

Symonds & O'Toole, *supra,* § 15.01, at 15–5 (footnotes omitted).

Fourth, and along different lines, a creditor of an LLC can protect itself by seeking the appointment of a receiver. In certain circumstances, Section 18–805 authorizes a creditor of a terminated LLC to secure the appointment of a trustee or receiver. *See* 6 *Del. C.* § 18–805. LLC creditors also have a common law right to apply for a receiver. *See Ross Hldg. & Mgmt. Co. v. Advance Realty Gp., LLC,* 2010 WL 3448227, at *6 (Del.Ch. Sept. 2, 2010) (holding that a receiver can be appointed for an LLC pursuant to the Court of Chancery's "general equity powers").

Fifth, despite the lack of derivative standing, a creditor possesses a statutory right to enforce a member's obligation to make a contribution to the LLC. Subject to statutory limitations, if a creditor extends credit to an LLC in reliance on a member's obligation to make a contribution to the LLC or to return a distribution in violation of the LLC Act, then the creditor may enforce the obligation to the ex-

tent of the creditor's reasonable reliance. 6 *Del. C.* § 18–502(b). "Thus, in proper circumstances, [an LLC] creditor in effect may be placed in a position similar to that of the company itself in enforcing rights against members for contributions and returns." Symonds & O'Toole, *supra,* § 15.02, at 15–7. Under Section 18–505, usury is not a defense to an obligation of a member or manager to the LLC arising under the LLC agreement. *See* 6 *Del. C.* § 18–505. A member is obligated to make its required contributions to the LLC even if the member cannot perform because of death, disability, or some other reason. *See* 6 *Del. C.* § 18–502(a).

The right to enforce a contribution agreement under Section 18–502 has particular relevance to creditor derivative standing. Although it would require another historical digression to demonstrate the point fully, the ancestor of the creditor derivative action was developed in the nineteenth century, when courts concluded that creditors should have the equitable right to enforce on behalf of the corporation a subscription agreement between the corporation and a stockholder who failed to pay par value for his stock. *See generally* Bayless Manning & James J. Hanks, Jr., *Legal Capital* 24–26 (3d ed. 1990). Lenders were deemed to rely on a corporation's legal capital—essentially par value times shares issued—when extending credit, and legal capital in turn was considered a trust fund for the benefit of creditors. *See, e.g., Handley v. Stutz,* 139 U.S. 417, 427, 11 S.Ct. 530, 35 L.Ed. 227 (1891) (describing "settled doctrine" that the capital of a corporation is a trust fund for the payment of its debts and "that the law implies a promise by the original subscribers of stock, who did not pay for it in money or other property, to pay for the same when called upon by creditors"); *Hamor v. Taylor–Rice Eng'g Co.,* 84 F.

392, 395 (C.C.D.Del.1897) ("There are few, if any, doctrines more firmly rooted in our jurisprudence than that the capital stock of a corporation is a trust fund for the payment of the corporate indebtedness, before any distribution among the stockholders."). If a stockholder failed to pay par value and the corporation became insolvent, then equity permitted a creditor to enforce the subscription right on behalf of the corporation for the benefit of all creditors. *See* Edwin S. Hunt, *The Trust Fund Theory and Some Substitutes For It,* 12 Yale L.J. 63, 72 (1902) ("The trust fund theory has been, perhaps, most often applied to the case where a creditor of an insolvent corporation seeks to compel a stockholder to pay a balance claimed to be due on stock for which the par value has never been paid to the corporation.").

Creditors naturally attempted to expand by analogy the right to enforce a commitment to contribute capital into a right to recover for other wrongs that reduced capital or even the funds of the corporation in general. *See, e.g.,* Comment, *Rights of Various Types of Creditors in Property Unavailable To The Debtor,* 47 Yale L.J. 1164 (1938). That effort, which culminated in *Gheewalla,* was largely successful, but reasonable minds can debate whether the law should have developed in this fashion. As Vice Chancellor Strine has explained, expanding fiduciary duties to protect creditors

> is not unproblematic. Arguably, it involves using the law of fiduciary duty to fill gaps that do not exist. Creditors are often protected by strong covenants, liens on assets, and other negotiated contractual protections. The implied covenant of good faith and fair dealing also protects creditors. So does the law

of fraudulent conveyance. With these protections, when creditors are unable to prove that a corporation or its directors breached any of the specific legal duties owed to them, one would think that the conceptual room for concluding that the creditors were somehow, nevertheless, injured by inequitable conduct would be extremely small, if extant.

*Prod. Res.,* 863 A.2d at 789–90 (footnotes omitted). In a later decision, Vice Chancellor Strine revisited these themes:

> Both state law and federal law provide a panoply of remedies in order to protect creditors injured by a wrongful conveyance, including avoidance, attachment, injunctions, appointment of a receiver, and virtually any other relief the circumstances may require.... [Further,] financial creditors ... know how to craft contractual protections that restrict their debtors' use of assets. In a situation when creditors cannot state a claim that such contractual protections have been breached and cannot prove a fraudulent conveyance claim, the creditors' frustration does not mean that there is a gap in the remedial fabric of the business law that equity should fill. Rather, it means that we remain a society that recognizes that reward and risk go together, and that there will be situations when business failure results in both equity and debt-holders losing some money.

*Trenwick Am. Litig. Trust v. Ernst & Young, L.L.P.,* 906 A.2d 168, 199 (Del.Ch. 2006) (footnotes omitted), *aff'd sub nom. Trenwick Am. Litig. Trust v. Billett,* 931 A.2d 438 (Del.2007).

Today, the trust fund doctrine has been largely discredited and abandoned,[10] but

---

10. Ernest L. Folk III, *Review of the Delaware Corporation Law for the Delaware Corporation Law Revision Committee* 254–55 (1965–67)

("The trust-fund doctrine was decimated when directors on issuing no-par and low-par shares, could allocate large parts of the mar-

its spirit lives on in the post-insolvency corporate creditor derivative action. Through Section 18–502, the LLC Act sates any equitable desire to enable LLC creditors to enforce subscription agreements. By addressing the germ from which the analogous corporate creditor derivative action grew, the LLC Act removes the impetus for a similar experiment with LLCs.

In light of the expansive contractual and statutory remedies that creditors of an LLC possess, it does not create an absurd or unreasonable result to deny derivative standing to creditors of an insolvent LLC. The outcome does not frustrate any legislative purpose of the LLC Act; it rather fulfills the statute's contractarian spirit.

## III. CONCLUSION

Counts I–III are dismissed because CML lacks derivative standing. Count IV is dismissed for lack of jurisdiction, subject to CML's right to transfer the action to the Delaware Superior Court. *See* 10 *Del. C.* § 1902. **IT IS SO ORDERED.**

---

ket price to capital surplus rather than stated capital; for the premise of a viable 'trust-fund' doctrine is a fixed capital relatively large in relation to prospective liabilities."); S. Samuel Arsht & Lewis S. Black, *The Delaware General Corporation Law: Recent Amendments,* 30 Bus. Law. 1021, 1032 (1975) ("Not long after the enactment of the General Corporation Law ... the concept of corporate capital as a fund providing a safety margin for creditors began to erode.... The net result of the[ ] changes [in 1917 and 1927, authorizing no-par and low-par stock, with part of the consideration allocated to capital surplus,] was to dilute substantially the security, whether real or ephemeral, provided for creditors which was represented by corporate capital."); Norwood P. Beveridge, Jr., *Does a Corporation's Board of Directors Owe a Fiduciary Duty to Its Creditors?,* 25 St. Mary's L.J. 589, 600 (1994) (noting that the doctrine had "generally fallen into intellectual disrepute" by the end of the nineteenth century); Andrew D. Shaffer, *Corporate Fiduciary—Insolvent: The Fiduciary Relationship Your Corporate Law Professor (Should Have) Warned You About,* 8 Am. Bankr.Inst. L.Rev. 479, 546 (2000) ("[T]he trust fund doctrine is hopelessly inconsistent and lacks any semblance of a doctrinal foundation."); Edward H. Warren, *Safeguarding the Creditors of Corporations,* 36 Harv. L.Rev. 509, 546 (1923) (" 'The capital stock of a corporation is a trust fund for creditors.' This is a venerable utterance, sonorous, and of benevolent connotation. But it is not true.").