# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

CLIFFORD PAPER, INC., )
)
Plaintiff, )
)
v. ) **C.A. No. 2020-0448-JRS**
)
WPP INVESTORS, LLC; EDGAR [L.] )
SMITH, JR., RICHARD A. BAPTISTE, )
)
Defendants. )

## MEMORANDUM OPINION

Date Submitted: March 2, 2021
Date Decided: June 1, 2021

Samuel T. Hirzel, II, Esquire and Elizabeth A. DeFelice, Esquire of Heyman Enerio Gattuso & Hirzel LLP, Wilmington, Delaware and Matthew M. Oliver, Esquire of Lowenstein Sandler LLP, Roseland, New Jersey, Attorneys for Plaintiff Clifford Paper, Inc.

Oderah C. Nwaeze, Esquire, of Faegre Drinker Biddle & Reath LLP (formerly of Duane Morris LLP), Wilmington, Delaware, Attorney for Defendants WPP Investors, LLC and Edgar L. Smith, Jr.

**SLIGHTS, Vice Chancellor**

In 2004, Plaintiff, Clifford Paper, Inc. ("CPI"), along with Defendants, WPP Investors, LLC ("Investors") and its owners, Edgard L. Smith and Richard A. Baptiste (collectively, "Defendants"), formed World Pac Paper, LLC ("WPP" or the "Company") to distribute paper and packaging products and provide printing, shipping and warehousing consignment services to commercial and retail clients. CPI and Investors owned 45% and 55% of WPP, respectively. Under the Company's Operating Agreement, Smith and Baptiste, along with CPI's President, John Clifford, were designated to oversee WPP's operations as its managers.

Though this arrangement ran smoothly for a time, relations between the parties soured after CPI and Clifford opposed Smith's proposal to create a lucrative position in WPP for his wife with responsibilities duplicating services already performed for WPP by CPI. Undeterred, Smith and Baptiste unilaterally promoted Smith's wife to the position notwithstanding Clifford's contractual right to vote on the decision. According to Plaintiff's Amended Verified Complaint (the "Complaint"), that act marked the start of a concerted (and wrongful) effort by Smith and Baptiste to divert profits away from WPP to Investors and railroad CPI into divesting its interest in the Company. Smith and Investors have moved to dismiss the Complaint under Chancery Rules 12(b)(6) and 23.1.

1

At the threshold, CPI insists it has brought direct (as opposed to derivative) claims because it has challenged wrongful acts that have denied it the right under the Operating Agreement to vote on key decisions affecting the Company. In most instances, the denial of the franchise will cause direct harm to the owner, but not always. When classifying a claim as direct or derivative, Delaware courts focus not on the nature of the wrong but the nature of the alleged harm flowing from the wrong. Here, the harm, if any, flowing from the alleged wrongful conduct directly affected WPP, not CPI. CPI's claims, therefore, are derivative, not direct. Because CPI was not a member of WPP when it brought these claims and did not, in any event, make a demand on the WPP board to pursue the claims, or attempt to plead demand futility, Smith and Investors' motion to dismiss must be granted in full. My reasoning follows.

## I. BACKGROUND

I have drawn the facts from the well-pled allegations in the Complaint and documents properly incorporated by reference or integral to that pleading.[1]

---

[1] *See generally* Am. Verified Compl. (D.I. 18) ("Compl."); *see also Wal-Mart Stores, Inc. v. AIG Life Ins. Co.*, 860 A.2d 312, 320 (Del. 2004) (noting that on a motion to dismiss, the Court may consider documents that are "incorporated by reference" or "integral" to the complaint).

For purposes of this motion, I accept as true the Complaint's well-pled factual allegations and draw all reasonable inferences in Plaintiff's favor.[2]

## A. Parties

Plaintiff, CPI, is a Delaware corporation.[3] At all times relevant to this action, and prior to his passing in November 2018, non-party, Clifford, served as CPI's President and one of WPP's three "Managers" as defined in WPP's Operating Agreement.[4] CPI was at all relevant times the minority (45%) owner of WPP.[5]

Defendant, Investors, is an Ohio limited liability company.[6] It was at all relevant times the majority (55%) owner of CPI.[7]

Defendant, Smith, served as Chairman, Chief Executive Officer and, at all relevant times, one of three Managers of WPP.[8] Smith owns an 80% equity interest in Investors.[9]

---

[2] *Savor, Inc. v. FMR Corp.*, 812 A.2d 894, 896–97 (Del. 2002).

[3] Compl. ¶ 15.

[4] Compl. ¶¶ 15, 22; D.I. 1, Ex. A ("Operating Agreement") at 18.

[5] Compl. ¶ 16.

[6] Compl. ¶¶ 17–19.

[7] Compl. ¶ 17.

[8] Compl. ¶ 18.

[9] *Id.*

Defendant, Baptiste, served as President, Chief Operating Officer and one of three Managers of WPP.[10] Baptiste owns a 20% equity interest in Investors.[11]

Non-party, WPP, is a Delaware LLC formed by CPI and Investors on June 11, 2004, under the terms of the Operating Agreement.[12] Section 7.1 allocates WPP's Profits and Losses to Investors and CPI in proportion to their respective ownership interests.[13]

## B. Investors and CPI Form WPP

In June 2004, WPP was formed by CPI and Investors as a distributor of paper and packaging products and provider of printing, shipping and warehousing consignment services to commercial and retail clients.[14] CPI and Investors remained the only two Members of WPP, with Smith serving as WPP's Chief Executive Officer and Chairman and Baptiste serving as the Company's President and Chief

---

[10] Compl. ¶ 19.

[11] *Id.*

[12] Compl. ¶¶ 1, 16, 21.

[13] Operating Agreement § 7.1.

[14] Compl. ¶¶ 1, 16.

Operating Officer.[15]  At all relevant times, WPP had three Managers: Smith, Baptiste and Clifford.[16]

Section 8 of the Operating Agreement sets out the rights, responsibilities and procedures related to the Company's governance.[17]  Section 8.1 provides that, "[e]xcept as otherwise provided in this Agreement, all actions by the Managers on behalf of the Company shall require the consent of [the] majority of the Managers."[18] Section 8.3 sets out the procedure for Manager decisions relating to "Related Party Transactions," providing in relevant part:

> If any Manager shall have an ownership, financial, or familial relationship with any party . . . and said party desires or intends to enter into a material contract or agreement with the Company, then such Manager with a relationship described above shall not be permitted to participate in a vote regarding the Company's participation in said contract or agreement; provided however that John Clifford shall be permitted to so participate with respect to the Company's relationships with [CPI] and its affiliates.[19]

---

[15] Compl. ¶¶ 12, 15, 18–19, 21; *see also* Operating Agreement at 20.

[16] Operating Agreement at 20 (identifying Smith, Baptiste and Glen Butler as the three Managers designated by Investors and Clifford as the Manager designated by CPI); *see also* Compl. ¶ 22 (alleging that, while Butler was named as a Manager in Section 8.1(b) of the Operating Agreement, he resigned in 2006).

[17] *See generally* Operating Agreement § 8.1.

[18] *Id.*

[19] *Id.* § 8.3.

The Operating Agreement does not disclaim any fiduciary duties owed by the Managers, but Section 8.4 of the Operating Agreement exculpates Managers from any liability "to the Members or the Company for any mistake of fact or judgment or for the doing . . . or failure to do any act . . . in conducting the Company's business, operations and affairs, which may cause or result in any loss or damage to the Company or the Members."[20]  Managers are not exculpated under the Operating Agreement, however, for "fraud, gross negligence, willful misconduct or a wrongful taking."[21]  Finally, Section 8.10 states that, "[e]xcept as expressly provided in the Agreement," no Manager or Member has authority "to undertake or assume[] any obligation, debt, duty or responsibility on behalf of [] any Member or the Company, or to bind the Company in any way, to pledge its credit or to render it liable peculiarly for any purpose."[22]

While the Operating Agreement generally allows Members and Managers to engage in other business ventures, Section 14 delimits the specific instances where such outside corporate opportunities are prohibited.  Relevant here, Section 14(a) of the Operating Agreement provides that no Member or "Manager shall directly, or indirectly through any affiliate or related party . . .  solicit sales for, divert or take

---

[20] *Id.* § 8.4; Compl. ¶ 23.

[21] Operating Agreement § 8.4.

[22] *Id.* § 8.10.

6

away any customers from the Company."[23]  Specific exceptions are made for CPI and John Clifford, and for Defendants only as to a separate packaging company (World Packaging Company LLC) owned by Defendants.[24]

## C. The Relationship Between Investors and CPI Deteriorates

On June 11, 2004, WPP entered into an Administrative Services & Raw Material Supply Agreement with CPI (the "Services Agreement").[25]  Under this agreement, CPI managed all of WPP's accounts receivable, invoicing, financing and materials sourcing and coordination, among other administrative tasks.[26]  The Services Agreement contained a New Jersey choice of law and forum selection clause.[27] CPI performed its obligations under the Operating Agreement and Services Agreement without objection or controversy for over thirteen years.[28]

In September 2016, Smith expressed to Clifford his desire to create a salaried position at WPP for his wife, Toni M. Robinson-Smith M.D.[29]  Though Robinson-

---

[23] *Id.* § 14(a).

[24] *Id.* § 14(c).

[25] Compl. ¶¶ 4, 24–25.

[26] Compl. ¶ 24.

[27] Compl. Ex. B ("Services Agreement") § 8(e).

[28] Compl. ¶¶ 24–25.

[29] Compl. ¶ 26.

Smith had served previously at WPP in a minor sales role, Smith proposed that the Company promote her to Vice President of Administration, a new position with an annual salary of $185,000.[30] Clifford objected on the grounds that her excessive salary was beyond the means of the Company and her responsibilities would be duplicative of those contracted out to CPI under the Services Agreement.[31] Notwithstanding Clifford's stated objections, Smith and Baptiste moved unilaterally to create the role and hire Robinson-Smith to fill it, offering her the full $185,000 salary originally contemplated by Smith (and rejected by CPI).[32]

On March 10, 2017, Defendants delivered a letter (the "Termination Letter") to CPI's office giving Plaintiff 90 days' notice of Smith and Baptiste's intent on behalf of WPP to terminate the Services Agreement.[33] That same month, Defendants contacted a key mutual supplier to both WPP and CPI to negotiate an expansion of the business relationship on behalf of WPP.[34] Defendants told the supplier that WPP

---

[30] Compl. ¶¶ 26–27.

[31] Compl. ¶ 28.

[32] *See* Compl. ¶¶ 28–29.

[33] Compl. ¶ 34.

[34] Compl. ¶ 37.

would delay pursuing the new business opportunity with the supplier until after WPP's Services Agreement with CPI had fully terminated.[35]

On April 3, 2017, Defendants sent CPI a letter encouraging it to withdraw as a Member of WPP.[36] Smith then proposed to a CPI representative on behalf of Investors that WPP should replace the financing CPI had arranged for the Company with financing from MBE Capital Partners ("MBE"), despite the fact that MBE's financing rate was several times higher than the rate CPI had secured for WPP over the past 13 years.[37] CPI responded by pointing Smith to Section 8.10 of the Operating Agreement, which CPI read to prevent Smith from unilaterally undertaking "any obligation, debt, duty, or responsibility" on behalf of WPP or from "pledg[ing] [WPP's] credit or render[ing] it liable . . . for any purpose" without the unanimous consent of WPP's Managers, including Clifford.[38] Defendants apparently disagreed with that reading, and soon after unilaterally entered into a financing agreement with MBE and directed customers to remit payments due to WPP into an MBE-controlled bank account.[39]

---

[35] *Id.*

[36] Compl. ¶ 36.

[37] Compl. ¶ 38.

[38] Compl. ¶ 39.

[39] Compl. ¶¶ 39, 40, 57–58.

By letter dated June 26, 2017, Smith and Baptiste informed WPP customers that Investors was WPP's new "administrative services and financial agent."[40]  It is alleged that Defendants thereafter directed multiple longtime WPP customers to send payments for orders placed with WPP directly to Investors instead of the Company.[41]  The termination of the Services Agreement and appointment of Investors as the administrative services provider is alleged to have harmed Plaintiff "by diverting funds so that Plaintiff, which was then still a Member of WPP entitled to share in its profits, could not so share."[42]

## D. CPI Initiates Litigation in New Jersey

On May 1, 2017, CPI initiated an action against WPP, Investors, Smith and Baptiste in New Jersey state court asserting various claims arising from WPP's alleged breach of the Operating Agreement and the Services Agreement (the "New Jersey Action").[43]  The claims relating to the Operating Agreement were dismissed without prejudice in accordance with that agreement's exclusive Delaware forum selection clause; the claims relating to the Services Agreement are

---

[40] Compl. ¶ 40.

[41] Compl. ¶¶ 42–43.

[42] Compl. ¶ 44.

[43] Compl. ¶ 11.

still being litigated in New Jersey.[44]  In the course of the New Jersey litigation, CPI discovered Defendants had falsified versions of the Operating Agreement and Services Agreement for submission both to the Ohio Minority Business Enterprise authorities in 2005 and the court in the New Jersey Action in 2017.[45]  Smith has since claimed that he had verbal permission to affix Clifford's signature from the original agreements to the altered versions of those documents, which Clifford has denied.[46]

CPI also alleges that it learned during the course of discovery in the New Jersey Action that "Defendants falsely represented to Plaintiff and WPP's vendors that WPP had access to a $35 million line of credit through MBE, which it did not have."[47]  It is further alleged that "Defendants continued placing orders with vendors through WPP based on the false assurance of access to a non-existent line of credit, and diverted certain associated receivables to Investors, so that Plaintiff could not share in profits, in violation of Section 14(a) of the Operating Agreement."[48]

---

[44] *Id.*

[45] Compl. ¶ 45.

[46] *Id.*

[47] Compl. ¶ 46.

[48] *Id.*

### E. CPI Withdraws as a Member of WPP

On February 21, 2018, CPI and Investors entered into a Consent and Acknowledgement to Withdrawal Agreement (the "Withdrawal Agreement") to memorialize CPI's election to withdraw as a member of WPP.[49] Under the Withdrawal Agreement, CPI "relinquished . . . all ownership interests in [WPP], all claims to the return of its Capital Contribution, . . . all claims to the distribution of cash generated by [WPP], and all claims to any economic interests in [WPP] as a lender to or owner of the Company."[50] The withdrawal was expressly "subject in all respects to the reservation of all rights and remedies of the parties in respect of any and all claims, actions or proceedings by and between Investors . . . and CPI, which in each case are pending as of the date hereof in any court or before any judicial body of competent authority."[51]

---

[49] Compl. Ex. D ("Withdrawal Agreement").

[50] *Id*.

[51] *Id.* The parties specifically identified the New Jersey Action and agreed that neither party has "waive[d] or postpone[d]" its rights with respect to that litigation. *Id.*

## F. Procedural History

Plaintiff filed its first Verified Complaint on July 9, 2020,[52] which it amended on September 21, 2020.[53] The operative Complaint asserts five Counts.[54] Count I is a claim against Investors, Smith and Baptiste for breach of Section 8.1 of the Operating Agreement by excluding Clifford from voting on WPP's hiring of Robinson-Smith as Vice President of Administration.[55] Count II is a claim against Smith for breach of Section 8.3 of the Operating Agreement (governing related party transactions) by participating in WPP's decision to create a new position for his wife, whom he appointed unilaterally.[56] Count III is a claim against Investors, Smith and Baptiste for breach of Section 8.10 of the Operating Agreement by preventing CPI's representative Manager, Clifford, from voting on WPP's entry into a financing agreement with MBE.[57] Count IV is a claim against Investors, Smith and Baptiste for breach of Section 14(a) of the Operating Agreement by diverting payments from the Company to Investors following termination of the Services Agreement in the

---

[52] D.I. 1.

[53] D.I. 18.

[54] Compl. ¶¶ 50–67.

[55] Compl. ¶¶ 50–52.

[56] Compl. ¶¶ 53–55.

[57] Compl. ¶¶ 56–58.

summer of 2017.[58]  Count V is a claim against Investors, Smith and Baptiste for breach of the fiduciary duty of loyalty when they: (1) postponed the expansion of a lucrative business arrangement with a key mutual supplier to both WPP and CPI until after WPP's Services Agreement with CPI terminated; (2) unilaterally diverted sales from longtime WPP customers to Investors; and (3) unilaterally appointed Investors as WPP's administrative services agent, replacing CPI without affording its representative Manager, Clifford, a vote on the decision.[59]

Defendants filed their motion to dismiss the operative Complaint on October 23, 2020.[60]   After full briefing, oral argument and a supplemental submission, the   matter was deemed submitted for decision on March 2, 2021.[61]

## II. ANALYSIS

Defendants' showcase argument for dismissal is that CPI lacks standing to pursue its claims, all of which must be characterized as derivative.  Standing "refers

---

[58] Compl. ¶¶ 59–61.

[59] Compl. ¶¶ 62–67.

[60] D.I. 21 (Defs. WPP Invs., LLC's and Edgar L. Smith, Jr.'s Opening Br. in Supp. of their Mot. to Dismiss Pl.'s Am. Verified Compl.) ("Defs.' Opening Br.").

[61] *See* D.I. 23 (Pl.'s Answering Br. in Opp'n to Defs.' Mot. to Dismiss) ("Pl.'s Answering Br."); D.I. 25 (Defs. WPP Invs., LLC's and Edgar L. Smith, Jr.'s Reply Br. in Further Supp. of their Mot. to Dismiss Pl.'s Am. Verified Compl.) ("Defs.' Reply Br."); D.I. 31 (Oral Arg. on Defs. WPP Invs., LLC's and Edgar L. Smith, Jr.'s Mot. to Dismiss) ("Oral Arg. Tr."); D.I. 31 (letter regarding authority mentioned for the first time at oral argument).

14

to the right of a party to invoke the jurisdiction of a court to enforce a claim or redress a grievance."[62] "Standing is properly a threshold question that the Court may not avoid,"[63] and "a legal question that is well suited to resolution on a motion to dismiss."[64] "Where, as here, the question of standing is so related to the merits," and asks "not whether the Court can grant the requested relief to *any* plaintiff, but rather whether the Court can grant the requested relief to [*this*] plaintiff[], the appropriate framework [for deciding a motion to dismiss purported derivative claims] is under [Chancery] Rule 12(b)(6)."[65]

Chancery Rule 12(b)(6) requires dismissal of a complaint if the plaintiff cannot recover under "any reasonably conceivable set of circumstances susceptible of proof" based on the complaint's pled facts.[66] While the court need not accept conclusory allegations or "every strained interpretation of the allegations proposed

---

[62] *Morris v. Spectra Energy P'rs (DE) GP, LP*, 246 A.3d 121, 128 (Del. 2021) (quoting *Stuart Kingston, Inc. v. Robinson*, 596 A.2d 1378, 1382 (Del. 1991)); *see also El Paso Pipeline GP Co., L.L.C. v. Brinckerhoff*, 152 A.3d 1248, 1256 (Del. 2016) ("*El Paso Pipeline II*") (observing that without standing, "the court lacks the power to adjudicate the matter").

[63] *Morris*, 246 A.3d at 129.

[64] *In re AbbVie Inc. S'holder Deriv. Litig.*, 2015 WL 4464505, at *3 (Del. Ch. July 21, 2015).

[65] *Id.* (emphasis in original) (citation omitted).

[66] *Beck v. Brady*, 860 A.2d 809, 809 (Del. 2004) (TABLE) (quoting *Kofron v. Amoco Chems. Corp.,* 441 A.2d 226, 227 (Del.1982)).

by plaintiff,"[67] it "must accept as true all well-pled allegations in the complaint and draw all reasonable inferences from those facts in plaintiff's favor."[68] As the Court considers the viability of Plaintiff's claims under Rule 12(b)(6), it must remain mindful that "[t]he party invoking the jurisdiction of a court bears the burden of establishing the elements of standing."[69]

Under Delaware's Limited Liability Company Act, a claim will be deemed derivative when it is brought by a member "in the right of a limited liability company to recover a judgment in its favor."[70] The member's right to bring the action is conditioned upon a determination that "managers or members with authority . . . have refused to bring the action or if an effort to cause those managers or members to bring the action is not likely to succeed."[71] "The derivative suit is a corporate concept grafted onto the limited liability company form."[72] As such, "case law governing corporate derivative suits is equally applicable to suits on behalf of

---

[67] *In re Gen. Motors (Hughes) S'holder Litig.*, 897 A.2d 162, 168 (Del. 2006) (quoting *Malpiede v. Townson*, 780 A.2d 1075, 1083 (Del. 2003)).

[68] *In re Rouse Props., Inc.*, 2018 WL 1226015, at *10 (Del. Ch. Mar. 9, 2018) (citations omitted).

[69] *Dover Hist. Soc'y v. City of Dover Planning Comm'n*, 838 A.2d 1103, 1110 (Del. 2003).

[70] 6 *Del. C.* § 18-1001.

[71] *Id.*

[72] *Elf Atochem N. Am., Inc. v. Jaffari*, 727 A.2d 286, 293 (Del. 1999).

an LLC."[73] Thus, it is appropriate to look to our law of corporations when assessing whether CPI has brought direct or derivative claims and whether it has standing to prosecute the claims it has brought.

At the threshold, Defendants argue CPI has brought derivative claims but lacks standing to prosecute them both because it is no longer a member of WPP and because it has failed to satisfy the procedural imperatives under our law for asserting claims on behalf of a Delaware LLC.[74] More specifically, Defendants argue that CPI's claims, while packaged as direct claims, are actually claims belonging to WPP that CPI no longer has standing to bring derivatively, having withdrawn as a member of WPP more than three years ago and having released all claims to any interest it held in the Company.[75] Under 6 *Del. C.* § 18-1002, "[i]n a derivative action, the plaintiff must be a member or an assignee of a limited liability company interest *at*

---

[73] *VGS, Inc. v. Castiel*, 2003 WL 723285, at *11 (Del. Ch. Feb. 28, 2003).

[74] The Withdrawal Agreement reserved CPI's right to continue to prosecute claims it raised in the New Jersey Action, but also reserved Investor's right to raise any and all defenses to those claims. *See* Withdrawal Agreement. Thus, even if it is assumed that CPI's claims here mirror the claims that were brought and then dismissed in the New Jersey Action, such that they could be asserted again in Delaware under the Withdrawal Agreement, that same agreement preserved Investor's right to raise applicable defenses to the claims, including that CPI lacks standing to prosecute derivative claims.

[75] Compl. ¶¶ 12–15; Withdrawal Agreement.

17

*the time of bringing the action.*"[76]  This requirement reflects the well-understood

canon of our corporations law that "[t]he right to sue derivatively is a property right

associated with share ownership."[77]  Thus, to the extent CPI's claims are derivative,

they fail as a matter of law for CPI's lack of standing to assert them.

In a typical case, this court distinguishes between direct and derivative claims

by application of the well-settled test set out in *Tooley v. Donaldson, Lufkin &*

*Jenrette, Inc.*,[78] where the Court distilled the direct versus derivative analysis down

to two inquiries: "(1) who suffered the alleged harm (the [LLC] or the suing

[member], individually); and (2) who would receive the benefit of any recovery or

other remedy (the [LLC] or the [members], individually)?"[79]  CPI, however,

maintains that this is not a typical case.  According to CPI, because WPP was a two-

member LLC, *Tooley*'s two-part test cannot apply because it ignores the reality that

harm to the LLC caused by one member flows directly to the other member.

---

[76] 6 *Del. C.* § 18-1002 (emphasis added); *see also CML V, LLC v. Bax*, 6 A.3d 238 (Del. Ch. 2010), *aff'd*, 28 A.3d 1037 (Del. 2011) (upholding a plain reading of Section 18-1002's membership requirement.)

[77] *Urdan v. WR Cap. P'rs, LLC*, 2019 WL 3891720, at *8 (Del. Ch. Aug. 19, 2019), *aff'd*, 244 A.3d 688 (Del. 2020).

[78] 845 A.2d 1031 (Del. 2004).

[79] *Id.* at 1039; *see also Hindlin v. Gottwald*, 2020 WL 4206570, at *6 (Del. Ch. July 22, 2020) (applying *Tooley* in the LLC context).

18

I address this argument first. Because I disagree with CPI that this case is atypical, I go on to apply *Tooley* to the claims asserted here.

## A. *Tooley* Applies in the Context of a Two-Member LLC

As noted, CPI asserts that where, as here, claims arise from a dispute between members of a two-member LLC and only one member is harmed, "the relationships among the parties [become] so simple and circumstances so clear-cut that the distinction between direct and derivative claims becomes irrelevant . . . ."[80] Of course, 6 *Del. C.* § 18-1001 does not distinguish two-member LLCs from other LLCs when addressing derivative actions—a distinction our General Assembly easily could have codified had it been so inclined.[81] And CPI's cited authority relates only to claims arising from *dissolved* limited partnerships, whereas WPP remains a going concern.[82] Indeed, in CPI's favorite case, *In re Cencom Cable Income Partners, L.P.*, the court declined to apply *Tooley* only after observing that,

---

[80] Pl.'s Answering Br. at 16 (quoting *In re Cencom Cable Income P'rs, L.P.*, 2000 WL 130629, at *6 n.14 (Del. Ch. Jan. 27, 2000) (disregarding the direct versus derivative distinction for claims brought by one former limited partner against the other former limited partner for wrongdoing associated with the final transaction of a dissolved limited partnership)).

[81] *See* 6 *Del. C.* § 18-1001.

[82] The only case CPI cites not in the dissolved entity context is *Stevanov v. O'Conner*, but the court there *deferred* (but did not reject) application of *Tooley* because it required "a more thorough development of the record [to] clarify the law or its application." 2009 WL 1059640, at *6 (Del. Ch. Apr. 21, 2009) (internal quotations and citation omitted).

"[w]ith the partnership in dissolution the 'partnership' entity is simply an artifice representing the relationship between two legally juxtaposed parties and is no longer relevant as a distinct legal creature for the purpose of resolving the final claims between those parties."[83]  Our courts have since made clear that *Cencom* is "limited to its own unique set of facts,"[84] and that the presence of "a partnership that had been liquidated or dissolved" was a "material[]" distinction in determining the extent to which *Tooley* should apply.[85]

That distinction was brought to the fore in *Dietrichson v. Knott*, where then-Vice Chancellor Montgomery-Reeves applied *Tooley*'s test to breach of fiduciary duty claims asserted by one 50% member of an LLC against the other 50% member.[86]  CPI did not address *Dietrichson* either in briefing or at oral argument, and no wonder: as a case applying *Tooley* in the context of a two-member LLC, its example directly contradicts CPI's proffered state of Delaware law.  Indeed, the court in *Dietrichson* dismissed the plaintiff's fiduciary duty and waste claims after

---

[83] *Cencom*, 2000 WL 130629, at *6.

[84] *Agostino v. Hicks*, 845 A.2d 1110, 1125 (Del. Ch. 2004).

[85] *Metro. Life Ins. Co. v. Tremont Gp. Hldgs., Inc.*, 2012 WL 6632681, at *10 (Del. Ch. Dec. 20, 2012) ("I see no basis for expanding *Cencom* to entities . . . [that are] relevant as [] distinct legal creature[s] for the purpose of resolving the final claims between [the disputing] parties." (internal quotation and citation omitted)).

[86] 2017 WL 1400552, at *1, *4–5 (Del. Ch. Apr. 19, 2017) (dismissing derivative claims on a motion to dismiss).

20

concluding they were derivative in nature and finding the plaintiff did not make a demand on the board or attempt to plead demand futility.[87]  The same analysis is required here.

## B. *Tooley*'s Application Requires Dismissal of Plaintiff's Complaint

As noted, the test set forth in *Tooley* assesses the nature of a claim by reference to two questions: "(1) who suffered the alleged harm (the [LLC] or the suing [member], individually); and (2) who would receive the benefit of any recovery or other remedy (the [LLC] or the [members], individually)?"[88]  The first prong of *Tooley* directs the Court's analysis to the nature of the alleged harm; the "claimed direct injury must be independent of any alleged injury to the corporation.  The stockholder must demonstrate that the duty breached was owed to the stockholder and that he or she can prevail without showing an injury to the corporation."[89]  Under the second prong of *Tooley*, "[w]here all of a corporation's stockholders are harmed and would recover *pro rata* in proportion with their ownership of the corporation's stock solely because they are stockholders, then the claim is derivative in nature."[90]

---

[87] *Id.* at *4–5.

[88] *Tooley*, 845 A.2d at 1039; *Hindlin*, 2020 WL 4206570, at *7 (applying *Tooley* in the LLC context).

[89] *Tooley*, 845 A.2d at 1039.

[90] *El Paso Pipeline II*, 152 A.3d at 1261 (quoting *Feldman v. Cutaia*, 951 A.2d 727, 733 (Del. 2008)).

21

When judging a plaintiff's claim against *Tooley*'s rubric, the court awards no style points for artful pleading. Just because a plaintiff stamps the word "direct" on its plead claim does not make it so.[91] Rather, the court must look past the labels to discern "the nature of the wrong alleged, taking into account all of the facts alleged in the complaint, and determine for itself whether a direct claim exists."[92]

Plaintiff's claims can be divided into contract and fiduciary duty claims. I address each in turn.

### 1. Plaintiff's Contract Claims are Derivative

CPI brings in Counts I–IV claims based on alleged breaches of the Operating Agreement. The contract claims come in two varieties. First, in Count IV, CPI alleges Defendants breached Section 14(a) of the Operating Agreement by diverting payments from WPP to Investors.[93] CPI asserts it suffered direct harm because, as the only member of WPP without equity in Investors, it was "the only party directly damaged by diversion of funds."[94] Second, in Counts I–III, CPI alleges Defendants

---

[91] *Hartsel v. Vanguard Gp., Inc.*, 2011 WL 2421003, at *16 (Del. Ch. June 15, 2011) ("The manner in which a plaintiff labels its claim and the form of words used in the complaint are not dispositive").

[92] *Id.*; *see also Kramer v. W. Pac. Indus., Inc.*, 546 A.2d 348, 353 (Del. 1988) ("In determining the nature of the wrong alleged, a court must look to 'the body of the complaint, not to the plaintiff's designation or stated intention." (citation omitted)).

[93] Compl. ¶ 43.

[94] Compl. ¶ 42.

breached various provisions of the Operating Agreement by denying its Manager, Clifford, a right to vote on certain decisions.

Count IV's diversion-of-payments claim is quintessentially derivative. Because it is the *Company*'s funds Defendants are alleged to have diverted, the harm caused by Defendants' actions flows directly to the Company, and only derivatively to its members. In the same way, any recovery of such funds would flow first to the Company only then to be distributed *pro rata* to its members.[95] "Claims are treated as derivative when they naturally assert that the corporation's funds have been wrongfully depleted."[96] CPI's attempt to convert a diversion-of-funds claim from

---

[95] *See In re Happy Child World*, 2020 WL 5793156, at *11–34 (Del. Ch. Sept. 29, 2020) (calculating damages flowing from derivative claims against a stockholder/fiduciary and "round tripping" those damages to the company's stockholders *pro rata*); *see also Dietrichson*, 2017 WL 1400552, at *4–5 (explaining that plaintiff's recovery for defendant's self-interested diversion of funds "would [run to] the Company, not [plaintiff]. [Plaintiff] would only receive his portion of recovery as an indirect benefit and *pro rata* according to his membership interest under the Operating Agreement." (internal citations omitted)). I note that CPI may have had a basis to argue for direct *recovery* of any judgment obtained on the derivative claims if it had standing to pursue those claims. *See In re El Paso Pipeline P'rs, LP Deriv. Litig.*, 132 A.3d 67, 121 (Del. Ch. 2015) ("*El Paso Pipeline I*") (discussing equitable grounds to allow stockholders to recover on derivative claims directly, particularly with respect to claims against controlling stockholders), *rev'd on other grounds*, *El Paso Pipeline II*, 152 A.3d 1248. The fact that there may be a basis to allow the stockholder to recover directly on a derivative claim, however, does not render the claim any less derivative.

[96] *Dietrichson*, 2017 WL 1400552, at *4 (internal quotations and citations omitted); *see also Kramer*, 546 A.2d at 353 (holding claims of corporate mismanagement resulting in a depletion of corporate funds are derivative because they represent a wrong to the corporation indirectly experienced by all shareholders); *Feldman*, 951 A.2d at 735 (Del. 2008) (noting waste claims are derivative in nature).

23

derivative to direct based on its identity as one of two unitholders in WPP fails; for reasons already explained, an LLC's two-member status does not preclude application of *Tooley*. Where, as here, one of two members brings a claim that the other member has depleted company assets, that claim is and remains derivative.[97]

Plaintiff's voting rights claims require a separate analysis. Counts I and II relate to Smith hiring his wife over CPI's objection: Count I alleges breach of Section 8.1, which entitled Clifford to vote on the hire, while Count II alleges breach of Section 8.3 for Smith having voted on a related party transaction from which he was obligated to abstain. Count III alleges breach of Section 8.10 for denying Clifford an opportunity to vote on WPP's entry into a financing agreement with MBE. As to each of these claims, CPI argues that, because its bargained-for voting rights under the Operating Agreement were denied, the harm flowing from these breaches was direct.

To be sure, breach of a contractual right to vote may constitute a direct claim under *Tooley*.[98] But there is a difference between the nature of a breach and the

---

[97] *See Dietrichson*, 2017 WL 1400552, at *4.

[98] *See, e.g.*, *Gotham P'rs, L.P. v. Hallwood Realty P'rs, L.P.*, 1998 WL 832631, at *1, *5 (Del. Ch. Sept. 30, 2013) (holding voting dilution claim constituted direct harm); *but see Hindlin*, 2020 WL 4206570, at *7 (holding voting dilution claim constituted derivative harm).

alleged harm flowing from that breach; to determine whether a claim is direct or derivative, *Tooley* instructs that our courts train their focus on the latter.[99]

In this case, CPI alleges that Robinson-Smith's hiring was "[i]n furtherance of [Defendants'] plan to divert scarce WPP resources away from Plaintiff in order to fund Robinson-Smith's excessive salary."[100] "The hiring of Robinson-Smith," CPI alleges, "provided substantial economic benefit to Smith" (through his spouse), and Smith's actions were taken to enrich himself to WPP's detriment.[101] CPI further alleges that it opposed Robinson-Smith's hiring because it "would be duplicative [of work already contracted to CPI] . . . and that in any event, WPP could not afford to create the position, given its then-marginal profitability."[102] Viewed through

---

[99] *See, e.g.*, *In re J.P. Morgan Chase & Co. S'holder Litig.*, 906 A.2d 766, 771–73 (Del. 2006) (classifying as derivative a disclosure claim in the context of a merger because, "[e]ven if it were assumed that improper proxy disclosures induced JPMC's shareholders to approve the merger (including the $7 billion overpayment), the harm resulting from the overpayment was to JPMC.").

[100] Compl. ¶ 7. I note that, although CPI alleges Smith "suggested that Plaintiff reduce its Administrative Fee [under the Services Agreement] to make available funds to pay Robinson-Smith's proposed $185,000 annual salary," it does not allege Smith *actually* reduced CPI's fee to fund Robinson-Smith's salary upon her hiring. *See* Compl. ¶¶ 28–29. To the extent Defendants wrongfully caused WPP to terminate the Services Agreement to make way for Robinson-Smith, that claim can be litigated as a breach of the Services Agreement in the New Jersey Action.

[101] Compl. ¶ 33; *see also* Compl. ¶ 27.

[102] Compl. ¶ 4; *see also* Compl. ¶¶ 27–28 ("Clifford . . . explained to Smith that creating the position would not be economically viable for WPP due to the excessive salary figure, and that the position's responsibilities would be duplicative of functions Plaintiff was already performing for WPP under the Services Agreement.").

*Tooley*'s lens, the harm of wastefully hiring unnecessary personnel accrues to the Company, with any recovery in the first instance running directly to the entity. That is a derivative claim.[103]

Confronted with its own (amended) pleadings, CPI raised for the first time at oral argument *Fletcher International Ltd. v. ION Geophyiscal Corp.*[104] to support its argument that it was directly harmed by Defendants' hiring of Robinson-Smith.[105] In *Fletcher*, then-Chancellor Strine calculated the expectation damages flowing from a company's violation of a shareholder-hedge fund's consent rights with respect to a bridge loan extended to maintain the company's solvency until it received a more

---

[103] *See Dietrichson*, 2017 WL 1400552, at *4–5; *see also J.P Morgan*, 906 A.2d at 771 (observing that "claims of waste are classically derivative"); *Protas v. Cavanaugh*, 2012 WL 1580969, *6 (Del. Ch. May 4, 2012) (noting that corporate waste claims are derivative as they rest on harm to the corporation).

[104] *Fletcher*, 2013 WL 6327997 (Del. Ch. Dec. 4, 2013).

[105] Oral Arg. Tr. at 48:11–50:4. The only other case CPI cites in support of its theory that the hiring of Robinson-Smith gave rise to a direct claim is *Gotham Partners, L.P. v. Hallwood Realty Partners, L.P.*, where the court construed as direct a plaintiff's claim that its vote was diluted when the limited partnership's corporate general partner allegedly engaged in a series of unfair and self-dealing unit transactions aimed to increase its ownership stake in the limited partnership. 1998 WL 832631, at *1, *5. The court reasoned that "the disputed transactions impinged upon the unit holder's right to terminate the general partner. The injury is specific to the unit holders as a class as opposed to a harm inflicted upon the limited partnership." *Id.* at *5. Unlike *Gotham*, CPI's claim in this case is that its right to vote was *denied* and it seeks compensatory damages for the Company's resulting wasteful expenditure of resources on unnecessary personnel. *See* Compl., Prayer for Relief ¶ A (seeking compensatory damages for its claims); *see also J.P. Morgan*, 906 A.2d at 772–73 (classifying as derivative a claim of voting dilution where the plaintiff sought compensatory damages identical to those suffered by the company).

26

substantial cash infusion.[106] The hedge fund's theory of damages was that it could have leveraged its consent right over the bridge loan to extract for itself outsized financial benefits.[107]

As noted, however, CPI's pled theory is different. Specifically, CPI affirmatively pleads that it would "not consent to the creation or funding of Robinson-Smith's position"[108] because the position "would be duplicative" of work already being performed for WPP and "WPP could not afford to create the position, given its then-marginal profitability."[109] Thus, CPI's allegations not only belie its contention that it would have extracted (and so was denied) a direct benefit in exchange for its vote, but also demonstrate that, to the extent any negotiation occurred, CPI would have negotiated for the benefit of the *Company*, not itself. That fact is underscored by the damages CPI seeks: while the hedge fund in *Fletcher* sought expectation damages for loss of *its* consent rights, CPI seeks *compensatory* damages for losses incurred *by WPP* as a result of Defendants' breach of the

---

[106] *Fletcher*, 2013 WL 6327997, at *1–2, *17–25.

[107] *Id.* at *13–16 ("[The hedge fund's expert's] entire report was premised on the notion that [the hedge fund] was willing to strap a bomb onto its chest and blow up the entire [] deal, force [the company] into bankruptcy, and decimate its own investment portfolio if it was not paid a ransom in exchange for its consent to a transaction that was already expected to create substantial value for it.").

[108] Compl. ¶ 5.

[109] Compl. ¶ 4.

Operating Agreement.[110]  "[T]he fundamental principle governing entitlement to compensatory damages . . . is that the damages must be logically and reasonably related to the harm or injury for which compensation is being awarded."[111]  As pled, those damages would flow from the hiring of Robinson-Smith, which could only have occurred in the first instance at the Company's expense.  Because the ultimate harm of Defendants' actions accrued to WPP, and any remedy would run first to WPP, Counts I and II are both derivative.

The same analysis applies to Count III, where CPI alleges that Defendants' decision to replace WPP's then-financial services provider, M&T Bank, with MBE resulted in "a rate several times that which Plaintiff had secured for WPP under the Services Agreement."[112]  Again, while the alleged *breach* was the denial of CPI's voting rights, the alleged *harm* was suffered by the Company, which ultimately was forced to shoulder a higher financing rate.  Any recovery would thus run first to WPP, benefiting its stockholders derivatively.[113]  "Where all of a corporation's stockholders are harmed and would recover *pro rata* in proportion with their

---

[110] *See* Compl., Prayer for Relief ¶ A.

[111] *J.P. Morgan*, 906 A.2d at 773.

[112] Compl. ¶ 38.

[113] Again, to the extent this conduct violated the Services Agreement, or some other separate commitment running from WPP to CPI, CPI may assert that claim in the New Jersey Action.

ownership of the corporation's stock solely because they are stockholders, then the claim is derivative in nature."[114]

For the foregoing reasons, all of CPI's contract claims are derivative. That leaves CPI's fiduciary duty claim in Count V, which, as explained below, is also derivative.

### 2. Plaintiff's Fiduciary Duty Claims are Derivative

Count V asserts Defendants breached their fiduciary duty of loyalty in three respects. First, Defendants allegedly "postpone[d] the [Company's] expansion" of a "lucrative business" opportunity with a "key" supplier until after WPP terminated its Services Agreement with CPI and then appointed Investors as the new administrative services provider.[115] Second, Defendants allegedly "breached their duty of loyalty when they unilaterally diverted sales from longtime WPP customers to Investors," thereby "denying Plaintiff's right to share in WPP's profits earned from those sales."[116] Third, Defendants allegedly violated their duty of loyalty by "unilaterally appoint[ing] Investors . . . as WPP's new administrative services agent, replacing Plaintiff without affording Plaintiff's representative Manager, John

---

[114] *El Paso Pipeline II*, 152 A.3d at 1261 (quoting *Feldman*, 951 A.3d at 733).

[115] Compl. ¶¶ 37, 64, 66–67.

[116] Compl. ¶ 65.

Clifford, a vote on the transaction."[117]  CPI argues these are direct claims because Defendants prevented CPI from duly exercising its rights under the Operating Agreement and, in doing so, made material misrepresentations to CPI.[118]

The harm suffered by Defendants' disloyal postponement of a lucrative business expansion and diversion of business from WPP to Investors runs first to WPP, as profits from both opportunities would accrue to the Company.  It follows that the Company would also receive the benefit of any resulting recovery, with CPI benefiting from such opportunities derivatively, in proportion to its equity stake in WPP.   Under *Tooley*, then, these fiduciary duty claims are derivative.

In the same vein, CPI alleges Defendants terminated the Services Agreement "[i]n furtherance of their plan to divert scarce WPP resources" to themselves,[119] resulting ultimately in "WPP's actual losses to total $1,225,049 . . . ."[120]  CPI further alleges that "[t]he termination of the Services Agreement and appointment of

---

[117] Compl. ¶ 66.

[118] Compl. ¶¶ 45–46, 62–67.  CPI admits that there is "overlap between the breach of contract claims and the breach of fiduciary duty claims in the Amended Complaint." Pl.'s Answering Br. at 38.

[119] Compl. ¶ 7.

[120] Compl. ¶ 8; *see also El Paso Pipeline II*, 152 A.3d at 1261 ("[T]he alleged overpayment left the Partnership $171 million poorer.  Any economic harm to [plaintiff] devolved upon him as an equity holder in the form of the proportionally reduced value of his units— a classically derivative injury." (internal citations and quotations omitted)).

Investors as the administrative services provider . . . damaged Plaintiff by diverting funds so that Plaintiff, which was then still a Member of WPP entitled to share in its profits, could not so share."[121] By the Complaint's own pleading, then, the harm flowing from Defendants' self-interested assumption of responsibilities enumerated in the Services Agreement flowed to WPP directly. Any resultant compensatory recovery for such harm, therefore, would flow first to the Company and only derivatively to its members. This is the very definition of a derivative claim under *Tooley*.

\* \* \* \* \*

Under 6 *Del. C.* § 18-1001, only members (or assignees) may bring derivative claims on behalf of a Delaware LLC. CPI lacks standing because it is no longer a member of WPP (nor was it when it initiated this litigation). Moreover, 6 *Del. C.*

---

[121] Compl. ¶ 44. To be clear, CPI does not allege Defendants violated their fiduciary duties by terminating the Services Agreement. And, while CPI perhaps could have alleged direct harm against Defendants through their tortious interference with the Services Agreement, it has elected to litigate its Service Agreement-related claims against WPP (and Investors) in New Jersey. Compl. ¶ 11. Rather, CPI alleges in Count V that Defendants breached their fiduciary duties by contracting to themselves work for which they were overpaid by WPP. Compl. ¶ 8 (alleging that replacing CPI under the Services Agreement cost WPP "actual losses to total $1,225,049"); Compl. ¶ 41 (alleging Defendants' breached their fiduciary duties by reference to Section 8.3 of the Operating Agreement, which sets forth WPP's Related Party Transactions voting policy); Compl. ¶ 44 (alleging Defendants' replacing the Services Agreement "directly damaged Plaintiff by diverting funds so that Plaintiff, which was then still a Member of WPP entitled to share in its profits, could not so share. This self-serving termination and purposeful, wrongful diversion of funds to Investors breached Smith's and Baptiste's fiduciary duties.").

§§ 18-1001 and 18-1003 require that the member make a pre-suit demand or plead demand futility before filing derivative claims.[122] Because CPI undisputedly did not make a pre-suit demand or plead demand futility, Smith and Investors' motion to dismiss the Complaint must be granted in full.

## III. CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss Counts I–V is granted.

**IT IS SO ORDERED.**

---

[122] 6 *Del. C.* §§ 18-1001, 18-1003.